Walter GODCHAUX, Jr.

v.

CONVEYING TECHNIQUES, INC.

Civ. A. No. 85–0400.

United States District Court,
E.D. Louisiana.

May 1, 1987.

---

Robert B. Bieck, Richard Tyler, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for defendant.

## FINDINGS AND CONCLUSIONS

LIVAUDAIS, District Judge.

This case arises out of the December 30, 1982 sale of all of the capital stock of Nadustco, Inc. (Nadustco) to Conveying Techniques, Inc. (CTI) and the latter's refusal to pay the balance due on a promissory note representing a portion of the purchase price. The plaintiff is Walter Godchaux, Jr. (Godchaux). In this litigation, Godchaux acts for himself, individually, as majority owner of Nadustco's stock on and before December 30, 1982 as well as in his representative capacity for the following persons who also owned Nadustco's stock on and before December 30, 1982 and, on that date, sold that stock to CTI: Barbara Godchaux Bailey, Thomas P. Chambers, Mrs. Warren A. Durham, Leon Godchaux, II, Leon Godchaux, III, W.P. Hamburger, Nellie S. Hillyer, Erwin R. Johnson, David A. Los Calzo, Richard McCarthy, A.M.G. Pollack, Joseph A. Pollack, Susan Pollack, Robert Zachery, and Bess G. Roos. All of these listed individuals have their domicile in States other than Texas. Pretrial Order of February 18, 1986, as amended by the Fourth and Amending Pretrial Order, (collectively "P.T.O."), Uncontested Facts ("U.F.") 5,7.

The defendant and counter-claimant is CTI, a Texas corporation with its principal place of business located in Texas. CTI designs, manufactures, and installs conveying equipment such as unit handling systems, bulk handling systems, pipe handling, and processing systems. P.T.O., U.F. 3,4. This Court has subject matter jurisdiction over this action by virtue of diversity of citizenship and an amount in controversy, exclusive of interest and costs, in excess of $10,000.00. 28 U.S.C. § 1332.

Because this Court has diversity jurisdiction it must apply the substantive law of the state in which it sits, *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct.

Marian M. Berkett, Deutsch, Kerrigan & Stiles, New Orleans, La., for plaintiff.

817, 82 L.Ed. 1188 (1938), including the choice-of-law rules of the jurisdiction, *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1920, 85 L.Ed. 1477 (1941). Louisiana choice-of-law rules provide that the law of the place of contracting determines the nature, validity, and construction of that contract. *Porter v. American Optical Corp.*, 641 F.2d 1128, 1144 (5th Cir.1981) (citing *United States Leasing Corporation v. Keiler*, 290 So.2d 427 (La.App. 4th Cir.1974); *Bologna Bros. v. Morrissey*, 154 So.2d 455 (La.App. 2nd Cir.1963)). The Agreement and Promissory Note underlying this dispute were executed in Louisiana, and accordingly, Louisiana law governs their construction and enforcement.

Considering the record as a whole, the pleadings, pretrial order, motions, objections, evidence, affidavits, uncontested material facts in the pretrial order, stipulations, exhibits, memoranda and arguments submitted, the Court makes the following findings and draws the following conclusions.

Roy Lee, Jr., who, with his wife, daughter, and two sons, owned all the outstanding stock of CTI, served as CTI'S President and as its representative in the purchase of Nadustco's stock from Godchaux. A businessman with over twenty years' executive experience, including, at the time of the Nadustco deal, over ten years of running his own company, Lee negotiated first with business broker William Blaney, and then with Godchaux himself, Godchaux's attorney, Haywood H. Hillyer, Jr. and Godchaux's accountant, Joel Rappaport of Fried, Rappaport & Company (Fried) between early June and late December, 1982. During this period, Lee chose not to consult or to utilize either an attorney or an accountant, but relied on his own expertise. He testified that he had access to Nadustco's financial statements, asset records, job contracts, and union contract.

An agreement, which was later amended, resulted from these negotiations. According to Lee's testimony, both he and Hillyer contributed to formulating that agreement (Joint Exhibit 1). It set the purchase price

of all of Nadustco's stock at $600,000.00, to be paid $300,000.00 cash, including an initial down payment of $10,000.00, and a promissory note in the sum of $300,000.00 for the balance "(subject to upward or downward adjustment as hereinafter provided) payable in twelve quarterly installments...." and bearing interest at 12% per year. Joint Exhibit 1 at ¶¶ 2. A. and B. A formula for adjusting the amount of the promissory note was included along with a warranty that

the financial statements of Nadustco above-described [of December 31, 1981] and June 30, 1982 are true and complete and have been prepared in accordance with generally accepted accounting principles consistently applied during the period January 1, 1975, to December 31, 1981....

(Joint Exhibit 1 at ¶ 6f). The agreement also contained a provision that the then-shareholders of Nadustco would indemnify CTI for damages resulting from breach of warranty (Joint Exhibit 1, ¶ 13). In the agreement, the parties jointly selected Fried as independent auditor to prepare the audited financial statements for the period January 1, 1982 to December 31, 1982. The parties agreed to pay their own expenses, except that the cost of the audit as of December 31, 1982 and legal expenses incurred by Nadustco prior to January 1, 1983, would be paid by Nadustco.

Before the scheduled December 30, 1982 closing, a dispute arose concerning the purchase price of Nadustco's stock as a result of Fried's treatment of tax loss carry-forward in the financial statements. Lee renegotiated the deal, again choosing to rely on his own abilities and experience rather than consulting an attorney or an accountant. Ultimately, the parties resolved this dispute when Lee submitted a December 30, 1982 *Amendment Letter to Agreement for Sale of Stock* to which Godchaux agreed (the Amendment). Joint Exhibit 2, P.T.O., U.F. 11.

The amendment decreased the purchase price from $600,000.00 to $527,000.00 and decreased the face amount of the promissory note from $300,000.00 to $227,000.00. It

included a provision that the audited financial statement of December 31, 1982 would "be prepared in accordance with generally accepted accounting principles applied on a consistent basis with the previous year's practices...." (Joint Exhibit 2). It further provided for adjustment of the note on the basis of the December 31, 1982 financial statements.

At the December 30, 1982 closing, CTI paid $300,000.00 cash and gave Godchaux its promissory note in the initial face amount of $227,000.00 (the note). The note provided, *inter alia:*

> This promissory note is the promissory note referred to in the agreement dated the 2nd day of December, 1982, between CTI and the shareholders of Nadustco, Inc., concerning CTI's purchase of all or substantially all of the issued and outstanding shares of Nadustco, Inc., as amended by letter dated December 28, 1982 [*sic:* December 30, 1982]. *This note is subject to the provisions of said Agreement, as amended, all of the terms, provisions, restrictions and benefits stated therein.*

Joint Exhibit 3 (Emphasis added); P.T.O., U.F. 15.

The December 31, 1982 financial statement which Fried prepared resulted in upwards adjustment of the Note to $262,937.50 on August 30, 1983.

Subsequently, Godchaux and CTI agreed to CTI's entitlement to a 50% credit on the following items:

| | | |
|---|---|---:|
| (a) | Louisiana Sales Tax Liability | $ 7,022.00 |
| (b) | attorney's fees incurred in sales tax matters | $ 7,422.67 |
| (c) | accountant's fees incurred in sales tax matters | $ 3,575.05 |
| (d) | Doussan, Inc. | $ 3,464.83 |
| (e) | over-estimated profit from Mississippi Ammunition Depo kpb | $ 1,126.00 |
| | TOTAL: | $22,610.55 |
| | CREDIT OF 50%: | $11,305.27 |

P.T.O., U.F. 26.

The time at which the credit should be applied is an issue before the Court.

Before release of the December 31, 1982 Nadustco financial statement on August 10, 1983, Lee signed a written statement dated August 4, 1983, as representative for Nadustco and CTI, sent to Fried, in which he stated that the corporation had no plans or intentions that may materially affect the carrying value or classification of assets and liabilities; that there were no material liabilities required to be disclosed; that no unasserted claims or assessments which were probable of assertion required disclosure; and that no events had occurred subsequent to the balance sheet date requiring adjustment or disclosure. P.T.O., U.F. 43 and 44.

Pursuant to its agreement with Godchaux, CTI made the following payments:

| Date | Principal | Interest |
|---|---|---|
| 04/17/83 | $18,916.67 | $6,810.00 |
| 07/04/83 | $18,916.66 | $6,242.49 |
| 10/03/83 | $28,151.03 | $8,909.32 |
| 01/09/83 | $21,883.68 | $5,878.59 |
| 04/06/83 | $21,883.68 | $5,281.55 |

P.T.O., U.F. 17.

CTI elected to have Nadustco cease active operations as of December 31, 1983, retaining only its New Orleans sales staff and a skeletal clerical and managerial staff in the New Orleans office. The business operations in which Nadustco engaged—the design, manufacture, selling and installation of pneumatic conveying systems and dust collection systems—were moved to Texas, where an "open" rather than "union" shop was employed.

Pursuant to this decision, Nadustco served notice on the Union Pension Plan of its withdrawal from the Plan by reason of its cessation of active business. The Union Pension Plan, through its attorneys, G. Phillip Shuler (Shuler) and Kevin L. O'Dea (O'Dea), served written notice, dated May 15, 1984, on Godchaux and Nadustco that Nadustco's cessation of business triggered withdrawal liability in the sum of $225,753.00 pursuant to the Multi-Employer Pension Plan Amendment Act of 1980 (MPPAA) and the Employee Retirement Income Security Act (ERISA). Joint Exhibit

C-3; see also Joint Exhibits 9, 10 and CTI Exhibit C-1. Finally consulting an attorney, Lee, for CTI and Nadustco, choose to pay the withdrawal liability without initiating arbitration or otherwise challenging it. CTI elected to exercise a quarterly payment option offered by the union, beginning December 31, 1984. CTI made the seven quarterly payments totalling $231,-216.35, thus satisfying Nadustco's obligation to the Pension Fund.

Although, according to Lee's testimony, CTI had had possession of the union contract, along with access to the books and records of Nadustco, throughout the negotiations for the purchase of the latter's stock; and although perusal of the union contract would have revealed the existence of a union pension plan, and although consultation with an attorney would have clarified the impact of MPPAA and ERISA upon CTI's decision to withdraw from the plan in 1983, CTI maintained that it lacked knowledge of its withdrawal liability, and that, therefore, responsibility for the consequences of this self-imposed ignorance rested with Godchaux. CTI at first demanded that Godchaux pay for or indemnify CTI's liability which arose out of its decision to withdraw from the union pension plan. When Godchaux refused, CTI informed Godchaux that it considered Godchaux in breach of the warranties set forth in the Agreement, as amended, and ceased all payments to Godchaux on the Note after ten payments, the last made on April 6, 1984. Neither party is happy, and both are suing. Godchaux is seeking the amount due on the note, as of April 6, 1984—$141,-913.04 plus interest thereafter at the rate of 12% per annum until paid. In addition, the Note provides that in the event of default in payment payee will be entitled to the principal and accrued interest and "all costs and a reasonable attorney's fee". Joint Exhibit 3. Godchaux maintains that "all costs" covers more than statutory court costs, and includes expert fees and expert witness fees as well. CTI maintains that it does not owe Godchaux the unpaid balance and interest thereon for two reasons. First, Godchaux allegedly breached its warranty that the financial statements of December 31, 1981, June 30, 1982, and December 31, 1982 had been "prepared in accordance with generally accepted accounting principles" applied consistently with the practices Nadustco had followed from January 1, 1975 onwards (Joint Exhibit 1 ¶ 6f and Joint Exhibit 2) and then failed to indemnify CTI for the alleged breach, as provided in ¶ 13 of the Agreement. These breaches amounted to a failure of consideration, according to CTI. Second, CTI asserts that the monies due CTI as a result of Godchaux's breach of warranty and obligation to indemnify CTI far exceed the alleged balance due on that Note, and that Godchaux in fact owes CTI a total sum of $171,086.88 plus post-judgment interest, along with attorneys' fees and costs. Like Godchaux, CTI believes the latter should include expert fees and expert witness fees under the indemnification agreement. For these sums, CTI has counter-claimed. Also at issue is the method of imputing the credit of $11,305.27 to which the parties have stipulated CTI is entitled. P.T.O., U.F. 26.

## IMPUTATION OF THE CREDIT

█ Godchaux and CTI agree that 50% of $1,126.00 on the Mississippi Ammunition Depot job should be credited as of the day of the Note, and Godchaux's claim reflects this credit. No other agreement as to the date on which the remainder of the $11,-305.27 is to be credited exists; contrary to CTI's contention, the sales agreement contains no provision requiring imputation on the date of the Note. With the exception of the $1,126.00, Nadustco and CTI had the benefit of remainder of the $11,305.27 from the date of the sale until those sums were disbursed in payment of the late developing debts. By seeking credit back to date of sale, CTI is essentially seeking damages for a loss before it occurred. Under Louisiana law, the prerequisite for an award of damages is that there be a legal right of recovery. *Ed Bulliard Co., Inc. v. Foretich-Zimmer Construction Co., Inc.,* 451 So.2d 29 (La.App. 3rd Cir.1984), *writ denied,* 456 So.2d 169; *National Roofing and Siding Co., Inc. v. Gulf Coast Oil Co. of Mississippi, Inc.,* 422 So.2d 204 (La.App.

4th Cir.1982). The defendant in this case has advanced no reason why he should be paid in advance for his later expenditures. This Court therefore holds that the credit of 50% of $1,126.00 from the Mississippi Ammunition Depo job is to date from the date of the note. The remainder of the terms which comprise the $11,305.27 are to be credited to CTI as of the date of expenditure on each item.

## THE AMOUNT DUE ON THE NOTE

■ It is uncontested that the plaintiff and defendant entered into an agreement for the sale of Nadustco for which the defendant gave, and made payments on, a promissory note. It is also uncontested that CTI stopped payments on the note; given the Court's ruling on the time when the agreed upon credits are to be imputed to CTI, the amount then owed on the note was $141,913.04. CTI's defense is that, because Godchaux allegedly breached the warranty in the sale agreement, the cause of the contract failed, and no further payments on the note are owed. In fact, CTI has counterclaimed against Godchaux for damages allegedly incurred owing to the alleged breach. This Court finds, however, that no breach of warranty occurred.

The defense of, and counterclaim in, warranty is based on the proposition that Paragraph 13(a) of the Agreement obligates Godchaux to indemnify CTI against "any damage or deficiency resulting from ... breach of warranty or ... from any omission from any certificate or other instrument furnished or to be furnished CTI under this agreement." See Joint Exhibits 1 and 2. The warranty allegedly breached is the warranty in Paragraph 6(f) of the Agreement that reads:

The shareholders, and each of them, represent and warrant in the proportion of their respect to shareholders stock ownership ... as follows:

\* \* \* \* \* \*

(f) That the financial statements of Nadustco above-described are true and complete and have been prepared in accordance with generally accepted accounting principles consistently applied during the period January 1, 1975 to December 31, 1981; however, it is understood that in arriving at the base price herein provided in paragraph 2, above, the method of handling deferred earnings, tax loss carry forward and reserves for tax liabilities were not the same as those used in the 1981 audited financial statement.

See Joint Exhibit 1 at 6(f) and the amendments in Joint Exhibit 2. The financial statements "above-described" are the ones described in Paragraph 5 of the Agreement, immediately preceding. Those are Nadustco's audited financial statements as of December 31, 1981 and unaudited but reviewed statement of June 30, 1982.

The December 31, 1982 statement did not exist at the time the Agreement was signed. The warranty of 6(f) could not have applied to it in light of 6(r) that provided

r ... the foregoing representations and warranties will be true and correct *at closing*. (Emphasis supplied).

Because the December 31, 1982 statement was not prepared until after closing, it could not have been included in a warranty of statements existing at that time.

CTI complains that Godchaux breached the warranty with respect to the 1981 and mid–1982 statements, alleging that these did not conform to "generally accepted accounting principles," because they did not include a footnote disclosing information about the union pension plan. According to Ken Tamblyn, CTI's expert on accounting procedure, the union pension plan was a defined benefit plan. The note would have revealed the existence of the plan; the employee group covered; the benefit status of the plan, that is, the amount of benefits vested and nonvested; and, if such information is unavailable, the fact that, and reasons why, it is unavailable. By contrast, Mr. Finnegan of Touche Ross, Godchaux's expert on accounting, identified the plan as a defined contribution plan. A note on such a plan in a financial statement would include the existence of the plan, the employee group covered, any changes in the amounts of contribution and the method by which the company funds the plan. The parties spent a great deal of breath at trial and ink afterwards wrangling over the

proper classification of Nadustco's union pension plan. However, whether it is of the "defined benefit" or "defined contribution" variety is irrelevant to the issue of whether Nadustco's warranted financial statements follow generally accepted accounting principles. Both parties' experts agreed that the threshhold question for including any disclosures concerning either type of plan is materiality, and that materiality is a matter of professional judgment. Mr. Tamblyn's evaluation of the materiality of the disclosure was based on information supplied to him by CTI's attorneys; they stated that as of December 31, 1982, Nadustco had an obligation to the union of $250,000.00. But no such liability to the union existed on that date, as this Court ruled on September 30, 1986. Mr. Tamblyn testified that without that fictional obligation, his opinion of materiality of the pension plan information—which in no way affected the figures in or the bottom line of the financial statement—would change. Mr. Finnegan testified that the materiality of the information was questionable, given the fact that the bottom line of the financial statements and net worth of the corporation would be unchanged by their inclusion. Joel Rappaport, a certified public accountant, had certified that he prepared the reports according to "generally accepted accounting principles"; thus, they represent that, in his professional judgment, the union pension plan did not pass the threshhold of materiality.

In *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 99 S.Ct. 773, 787, 58 L.Ed.2d 785 (1979) the Supreme Court of the United States recognized that the term "generally accepted accounting principles" contains some discretionary play in meaning:

> Accountants long have recognized that "generally accepted accounting principles" are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. "Generally accepted accounting principles," rather, tolerate a range of "reasonable" treatments, leaving the choice among alternatives to management.

This Court finds no departure from generally accepted accounting principles in the preparation of the warranted Nadustco financial statements.

■ A second objection to the plaintiff's contention that Godchaux breached its warranty exists. The warranty given by Godchaux under 6(f) carries with it a qualifying phrase. It calls for those generally accepted accounting principles applied by Nadustco during the period of January 1, 1975 to December 31, 1981. See Joint Exhibits 5, 6, and 7; testimony of Godchaux and Finnegan. None of the Nadustco financial statements during the period of 1975 to 1981 included notes on the Union Pension Fund. See Joint Exhibits 5, 6, and 7; testimony of Godchaux and Finnegan. During that period the financial statements of Nadustco were prepared by two different accounting firms, Alexander Grant and Fried, and although each attested that the statements were prepared in accordance with generally accepted accounting principles, neither considered it necessary to include the notes that CTI now insists should have been included. Joint Exhibit 5, 6, and 7. Thus, the parties agreed to financial statements which did not include reference to the union pension plan. Under Louisiana law, the words that the parties have agreed to should be given full effect in the absence of absurd results. La.Civil Code Ann. art. 2046. This Court must give effect to *all* the words of the warranty. *John Bailey Contractor, Inc. v. State*, 439 So.2d 1055, 1058 (La.1983). ("Court will not impute to the parties the use of language without meaning or effect."), Godchaux's warranty that Nadustco's financial statements were prepared "in accordance with generally accepted accounting principals consistently applied during the period January 1, 1975, to December 31, 1981" is plain, clear and unequivocal. The financial statements are in accordance with this warranty.

■ It is uncontested that CTI's president Roy Lee, Jr. representing the corporation, signed the agreement and promissory note for the purchase of Nadustco's stock. (Joint Exhibits 1, 2, and 3). The defendant, a corporation headed by an experienced businessman, choose to make the purchase without consulting an attorney or an accountant. It chose to shut down Nadustco's union operations, again without con-

sulting an attorney. It chose to pay its withdrawal liability to the union. Now, CTI seeks to avoid the consequences of its decisions and attempts to make the plaintiff shoulder them instead. Because this Court has found no breach of warranty, and because of our determination above concerning the proper time of imputation of the credits to which CTI is entitled, this Court finds that the plaintiff is entitled to judgment in the amount of $141,913.04, plus judicial interest at the rate of 12% from April 6, 1984 until paid. La.Civ.Code Ann. art. 2000 (West supp.1985). By terms of the promissory note, the plaintiff is further entitled to all costs and reasonable attorney's fees as well. The uncontroverted testimony at trial established that a reasonable hourly fee for plaintiff's attorney, who has extensive years of experience in litigation, is $200.00 per hour. The parties are directed to attempt to resolve this matter amicably and to report within twenty (20) days whether a stipulation as to attorney's fees and costs can be made, reserving all rights to contest entitlement to same on appeal.