Walter **GODCHAUX**, Jr.,
Plaintiff-Appellee,

v.

**CONVEYING TECHNIQUES, INC.**,
Defendant-Appellant.

No. 87–3398.

United States Court of Appeals,
Fifth Circuit.

June 6, 1988.

Robert B. Bieck, Jr., Richard J. Tyler, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for defendant-appellant.

Marian Mayer Berkett, Deutsch, Kerrigan & Stiles, New Orleans, La., for plaintiff-appellee.

Before GARZA, HIGGINBOTHAM and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Plaintiff Walter Godchaux, Jr., sold his Louisiana manufacturing business, Nadustco, to Conveying Techniques, Inc. ("CTI"), on December 30, 1982. One year later, on December 31, 1983, CTI withdrew Nadustco from Nadustco's union-negotiated, multiemployer pension plan. By a letter dated May 15, 1984, counsel for the pension plan

informed CTI that Nadustco had incurred a $225,753 "withdrawal liability." This withdrawal liability, which 29 U.S.C. § 1381 imposes upon employers who withdraw from a multiemployer pension plan,[1] is calculated according to the unfunded liability of the pension plan existing at the time that the employer withdraws. Shortly after it paid Nadustco's withdrawal liability, CTI stopped payments on a promissory note CTI had executed in Godchaux's favor as part of CTI's agreement to acquire Nadustco.

On January 25, 1985, Godchaux brought this diversity suit seeking $141,913.04 for breach of contract. CTI defended by asserting that Godchaux failed to inform CTI of the unfunded pension liability burdening Nadustco's union pension fund. CTI argued that Godchaux's failure to inform CTI of the unfunded vested liability of the pension plan breached two warranties in Godchaux's contract selling Nadustco to CTI. CTI also counterclaimed against Godchaux under the contract's indemnity provision for $171,086.88, the equivalent of Nadustco's withdrawal liability minus the payments CTI still owed Godchaux.

The district court, which disposed of one issue on summary judgment and the others after a bench trial, ruled that Godchaux had not breached either warranty. Consequently, the district court awarded Godchaux judgment on his breach-of-contract claim and denied CTI its indemnity counterclaim. 660 F.Supp. 220. CTI appeals the district court's judgment. We now affirm.

## I.

From 1956 until December 30, 1982, Walter Godchaux, Jr., essentially owned and operated Nadustco, which designed, manufactured, sold and installed pneumatic conveying systems and dust collection systems. In March 1982, Godchaux decided to sell Nadustco and hired William Blaney, a business broker, to find a buyer. Blaney, in early June 1982, contacted Roy Lee, Jr., president of CTI. Apparently Lee expressed CTI's interest in buying Nadustco, because Lee soon began negotiating with Godchaux and Godchaux's attorney for the purchase of Nadustco.

From June 1982 to December 1982, the parties negotiated and settled on several terms relevant to this lawsuit. Under one of those terms, the parties appointed Fried, Rappaport & Co., Nadustco's independent auditors, to prepare an audited financial statement (as of December 31, 1981) and a reviewed financial statement (as of June 30, 1982). Neither the audited statement, the reviewed statement, nor any of Nadustco's previous financial statements mentioned Nadustco's union pension plan or Nadustco's potential liability if it withdrew from that plan. Based upon the information contained in these financial statements, the parties reached an agreement under which Godchaux would sell Nadustco to CTI.

Under the terms of the eighteen-page sales agreement, which Lee and Godchaux signed on December 2, 1982, Godchaux and Nadustco's other shareholders agreed to sell Nadustco to CTI for $600,000. CTI contracted to pay $300,000 in cash and $300,000 in a promissory note bearing 12% interest.[2] The sales agreement also contains several express warranties over which the parties carefully bargained. CTI now claims that two of those warranties[3]

---

1. 29 U.S.C. § 1381 derives its current form from the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), which amended the Employee Retirement Income Security Act of 1974 ("ERISA").

2. The parties amended the sales agreement twice. Under the ultimate terms, the parties set the face value of the note at $257,374.50, with provisions (eventually worth $5,742.27) to credit CTI for half of certain taxes Nadustco paid in 1983.

3. The two warranties, contained in paragraph 6 of the contract, read in relevant part:

   6. The Shareholders [primarily Godchaux] ... represent and warrant ...
   f. That the financial statements of Nadustco above-described [the audited statement and the reviewed statement of December 31, 1981 and June 30, 1982 respectively] are true and complete and have been prepared in accordance with generally accepted accounting principles consistently applied during the period January 1, 1975 to December 31, 1981;

required Nadustco's financial statements, at Godchaux's peril, to reveal the financial status of Nadustco's union pension plan, which covered unionized workers under the terms of a collective bargaining agreement between Nadustco and Local 11 of the Sheet Metal Workers International Association (the "Union"). The terms of Nadustco's collective bargaining agreements with the Union continued to govern Nadustco's participation in the pension plan after CTI acquired Nadustco.[4]

The collective bargaining agreement, however, was a burden which CTI eventually concluded Nadustco could no longer bear. Consequently, Nadustco ceased doing business on December 31, 1983, and CTI moved Nadustco's operations to Texas. Through this maneuver, CTI succeeded in terminating its relationship with the union and in withdrawing Nadustco from the union pension plan.

CTI's business maneuvers, however, had legal effects which CTI apparently had not anticipated. Specifically, since the dissolution of Nadustco amounted to its withdrawal from the union pension plan, that dissolution triggered the provisions of 29 U.S.C. § 1381.[5] Under section 1381(a), an employer that withdraws from a multiemployer pension plan is liable for a portion of the plan's unfunded vested liability existing at the time of withdrawal. In Nadustco's case, that liability was $225,753, which CTI now claims Godchaux owes to it.

According to CTI, Godchaux breached his warranty that Nadustco did not have any liabilities which Nadustco's financial statements had failed to disclose to CTI. CTI argues that Nadustco's withdrawal liability under section 1381(a) existed from the moment the pension plan first developed an unfunded vested liability. Since Nadustco agreed to indemnify CTI for any liabilities of which Nadustco's financial statements had failed to inform CTI,[6] CTI concludes that Godchaux now owes it the $225,753 which CTI paid to cover Nadustco's withdrawal liability. Consequently, CTI stopped payments on its promissory note to Godchaux, and Godchaux sued CTI for breach of contract.

Godchaux argues that he did not violate either of the warranties and that withdrawal liability does not come into existence until the employer actually withdraws from the multiemployer plan. He also argues that Fried, Rappaport & Co. prepared Nadustco's financial statements in complete accordance with generally accepted accounting principles, as Godchaux warranted the accounting firm would.

## II.

█ We turn first to Godchaux's warranty to disclose all Nadustco liabilities that existed on December 31, 1982. Whether Godchaux breached this warranty depends entirely upon when withdrawal liability

---

g. That except to the extent reflected or provided in *Nadustco's balance sheets as of December 31, 1981*, and in reviewed but unaudited balance sheets as of June 30, 1982, Nadustco did not have any liabilities of any nature, whether accrued, absolute, contingent, or otherwise. . . .

4. The only obligation the collective bargaining agreement imposed on Nadustco was a duty to pay the plan $1.30 per each hour Nadustco's *union employees worked.*

5. 29 U.S.C. § 1381 reads in relevant part:
   (a) If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability.

6. Godchaux agreed, in paragraph 13 of the agreement to sell Nadustco, to indemnify CTI if

he violated the warranties at issue here. In relevant part, paragraph 13 reads:
   13. Shareholders [primarily Godchaux] shall indemnify and hold harmless CTI at all times subsequent to closing, against and in respect of:
   a. All liabilities of Nadustco of any nature, whether accrued, absolute, contingent, or otherwise existing at time of closing, to the extent not reflected or reserved in Nadustco's audited *financial statements at December 31, 1981* and at December 31, 1982 . . .; any damage or deficiency resulting from any misrepresentation, breach of warranty, or nonfullfillment [sic] of any agreement on the part of Nadustco or its Shareholders under this Agreement or from any misrepresentation in or omission from any certificate or other instrument furnished or to be furnished CTI under this Agreement. . . .

first existed as to Nadustco.[7] If withdrawal liability exists as soon as a pension plan develops an unfunded vested liability, then Nadustco's withdrawal liability was present before December 31, 1982, and Godchaux has breached his warranty. However, if withdrawal liability does not exist until the employer actually withdraws from the pension plan, then CTI itself triggered Nadustco's withdrawal liability on December 31, 1983, one year after Godchaux sold Nadustco to CTI. To resolve this question, we turn first to the statutory language.

Section 1381(a), which establishes withdrawal liability, reads: "If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, *then* the employer is liable to the plan in the amount determined under this part to be withdrawal liability" (emphasis added). If we construe this statute according to its most natural reading, then we must conclude that withdrawal liability does not exist until an employer actually withdraws from a multiemployer pension plan. The word "then" suggests that MPPAA's drafters envisioned a timeline of events leading to the creation of a withdrawal liability. First, an employer would join a multiemployer pension plan. Later, that employer would completely or partially withdraw from the plan. Finally, *and only after* the employer had joined and withdrawn from the plan, would that employer incur withdrawal liability.

CTI argues that we should modify this reading of section 1381(a) in light of the ERISA statutory scheme, of which section 1381(a) is but a part. According to CTI, the minimum funding requirements which ERISA imposes upon multiemployer pension plans[8] actually create withdrawal liability. Section 1381(a) and ERISA's other withdrawal liability provisions, as CTI reads ERISA, do not define withdrawal liability, but only determine when and to whom an employer must pay withdrawal liability.

ERISA calculates an employer's withdrawal liability according to the employer's proportionate share of the unfunded vested liability of the pension plan from which the employer withdraws. CTI asserts that ERISA does not create a "withdrawal liability" separate and distinct from unfunded vested liability. Instead, CTI argues, the withdrawal liability sections of ERISA merely provide a mechanism to enforce the employer's *pre-existing* statutory liability to help support the multiemployer pension plan's financial status.

We disagree with CTI's analysis. Although it is true that withdrawal liability is calculated according to the pension plan's pre-existing unfunded vested liability, that unfunded vested liability does not completely define or determine withdrawal liability. ERISA does not impose withdrawal liability on every employer that belongs to a pension plan that has an unfunded vested liability. Moreover, ERISA calculates withdrawal liability according to *when the employer withdraws from the pension plan.*

The timing of an employer's withdrawal from a multiemployer pension plan can affect the size and even the existence of the withdrawal liability. Here, Nadustco withdrew from the plan on December 31, 1983. Because Nadustco withdrew in plan year 1983, the plan's administrators calculated Nadustco's withdrawal liability according to the plan's unfunded vested liability for

---

**7.** CTI does not claim, and we can find no evidence in the record to suggest, that Nadustco had any undisclosed liabilities other than withdrawal liability. CTI also fails to cite any other statutory mechanism through which Nadustco could have been forced to pay any portion of its pension plan's unfunded vested liability. CTI's silence suggests that Nadustco never would have faced a bill for any portion of its share of the plan's unfunded vested liability until Nadustco withdrew from the plan. Moreover, CTI admits that Nadustco's contracts obligated it only to pay a predetermined fee for each hour one of Nadustco's union employees worked. Nadustco, as CTI admits, had no contractual duty to underwrite any part of any conceivable liabilities (through underfunding or otherwise) incurred by the pension fund.

**8.** ERISA imposes minimum funding requirements in 29 U.S.C. § 1082.

plan years 1979–1982.[9] Assuming that the plan years coincided with the calendar years, CTI could have changed Nadustco's withdrawal liability merely by waiting one day to withdraw Nadustco from the union pension plan: If Nadustco had withdrawn during 1984, the union pension plan's administrators would have included plan year 1983 in their calculations of Nadustco's withdrawal liability.

Thus, as CTI admitted in oral argument, the unfunded vested liability of a pension plan can change significantly from year to year or even disappear. The size of a pension plan's unfunded vested liability depends on many factors, as CTI concedes, including how well the pension plan administrators manage the pension's portfolio of investments,[10] how accurate their actuarial predictions are, and how generously they set pension benefits. *Peick v. Pension Benefit Guaranty Corp.*, 724 F.2d 1247, 1267 (7th Cir.1983), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984).

Moreover, CTI does not specify any means other than withdrawal liability through which Nadustco (or for that matter, Godchaux) would ever have been forced to assume any portion of the plan's unfunded vested liability. Consequently,

we have no reason to believe that Nadustco would ever have been liable for any of the plan's unfunded vested liability had CTI not voluntarily withdrawn Nadustco from the plan.[11] Thus, CTI triggered a liability it might otherwise have avoided by simply choosing not to withdraw Nadustco from the plan.[12]

Nonetheless, CTI continues to argue that *withdrawal liability* is the same as the *unfunded vested liability* of the pension plan. To support its argument, CTI relies heavily on *Trustees of Amalgamated Insurance Fund v. McFarlin's, Inc.*, 789 F.2d 98 (2d Cir.1986), in which the Second Circuit determined the treatment of withdrawal liability in bankruptcy proceedings. McFarlin's (a retailer) petitioned for bankruptcy in March 1982 but did not withdraw from its multiemployer pension plan until November 1982. The trustees of the pension plan requested the bankruptcy court to classify McFarlin's withdrawal liability as an "administrative expense."

An administrative expense, which includes "the actual, necessary costs and expenses of preserving the estate [of the bankrupt]," 11 U.S.C. § 503(b)(1)(A), takes priority over the other debts of a bankrupt. Congress enacted section 503(b)(1)(A) to

---

**9.** This methodology is required by 29 U.S.C. § 1391(b)(2)(A)(ii), which provides that the unfunded vested benefits to be considered are those for each plan year "before the plan year in which the withdrawal of the employer occurs."

**10.** We are not engaging in idle speculation when we assume that a pension plan's investments may perform well enough in a single year to eliminate a $225,000 unfunded vested liability. According to CTI's own figures, the unfunded vested liability of the union pension plan dropped more than 36% in plan year 1982 alone. The legal definition of "withdrawal liability" does not depend, of course, upon fortuitous events in the nation's capital markets. The point is that *when* an employer withdraws from a pension plan determines not only when and how the employer will pay its withdrawal liability, but also whether that withdrawal liability will increase, decrease, or even cease to exist. Godchaux had no control over either (i) when CTI chose to withdraw from the plan or (ii) whether the withdrawal liability created by CTI's withdrawal was more or less than the unfunded vested liability that would have been shown in a financial statement as of the date of sale.

**11.** We do not reach the question of whether any legal mechanism other than withdrawal liability exists to force an employer to assume a portion of its pension plan's unfunded vested liability. We note only that CTI has failed to show this court how those mechanisms might have affected CTI.

**12.** The withdrawal liability came into existence, therefore, only because CTI made a unilateral business decision regarding the management of the business and assets which it had purchased from Godchaux. By using or misusing those assets, CTI could have incurred numerous other liabilities (*e.g.*, tort liability, civil rights or affirmative action exposure, environmental damage, or consumer fraud), none of which would have been legally attributable to Godchaux. Simply put, what CTI chooses to do to maximize the economic potential of what was once Godchaux's business enterprise would have benefited CTI exclusively had it succeeded, and should not now harm Godchaux merely because it failed.

avoid discouraging potential creditors from doing business with a company attempting to rehabilitate itself. 789 F.2d at 101. To effect Congress's intent, the Second Circuit classifies a debt as an administrative expense *only if* the debt arose out of a transaction between the creditor and debtor that occurred after the debtor filed the bankruptcy petition. *Id.* Thus, whether withdrawal liability is an administrative expense depends not upon when withdrawal liability accrues, but upon when the bankrupt receives the consideration supporting withdrawal liability.

In *McFarlin's,* the Second Circuit decided that withdrawal liability was based upon consideration that was received before the debtor went bankrupt. The consideration for the bankrupt's withdrawal liability, the court concluded, was work which McFarlin's employees did before McFarlin's went bankrupt. *Id.* at 101–02. Payment for the employees' labor did not constitute an administrative expense because the labor "was not furnished for the benefit of the debtor in possession or for the continuation of McFarlin's business after it went into bankruptcy." *Id.* at 103.

*McFarlin's* did not turn on when withdrawal liability accrues, but upon when an employer receives the benefit which withdrawal liability is intended to compensate. It is thus easily distinguishable. Since withdrawal liability secures the solvency of a pension plan designed to compensate workers for work performed before the debtor went bankrupt, the Second Circuit held that withdrawal liability is not an administrative expense. "A debt is not enti-

tled to priority [as an administrative expense] simply because the right to payment arises after the debtor in possession has begun managing the estate." *Id.* at 101 (citation omitted). The Second Circuit did not determine, however, when withdrawal liability actually comes into existence as to an individual employer.[13]

Several other cases, which have considered when withdrawal liability accrues, bear more directly on the case at bar. Of these cases, *Peick v. Pension Benefit Guaranty Corp.* most thoroughly addresses the question. There, the Seventh Circuit ruled on the facial constitutionality of the withdrawal liability provisions of the MPPAA. To decide whether the Constitution forbids the withdrawal liability scheme which Congress passed, *Peick* first analyzed and interpreted that statutory scheme. "Under MPPAA, a withdrawing employer becomes liable *on the date of withdrawal* for a proportionate share of [the pension plan's unfunded vested liability]." 724 F.2d at 1256 (emphasis added). Recognizing that "the concept of unfunded vested liability involves a dynamic process," *id.* at 1267, the court described unfunded vested liability as an economic and legal concept so fluid that Congress could hardly define a liability based upon the concept of unfunded vested liability without designating a specific time at which to measure that unfunded vested liability.[14]

*Peick* concluded that Congress did not violate the due process clause of the fifth amendment when it chose to measure, and implicitly to define, withdrawal liability according to when the employer withdraws

---

**13.** CTI also relies heavily upon *Trustees of Amalgamated Ins. Fund v. William B. Kessler, Inc.,* 55 B.R. 735 (S.D.N.Y.1985) which *McFarlin's* cites with approval. 789 F.2d at 104. Since the two cases appear to stand for the same proposition, we do not view our decision in this case as in conflict with either *McFarlin's* or *Kessler.*

**14.** One may argue that [an unfunded vested liability] may in due course disappear through appreciation in value of the [pension plan's] assets. Or it may be reduced in time by a flood of new employee participants as to whom employer contributions will be required without a contemporaneous offsetting increase in employees whose benefits are vesting. On the other hand, if the value of [pension plan] assets does not appreciate or if employees whose benefits vest increase out of proportion to the increase of young employees for whom contributions are being made, then the deficiency in value of fund assets may grow worse. A third factor which also obviously affects the rise and fall of the unfunded liability is the liberality or conservatism with which the level of benefits is fixed. Of course, the entire calculus is significantly affected by the life expectancy assumptions and by present-value calculations involving interest rate assumptions. *Id.*

from the pension plan. "[T]he choice of the time of withdrawal for assessing the liability is far from irrational. It is at this time that Congress apparently believed the proposed withdrawer should be confronted with the immediate prospect of assuming the economic burden of providing an actuarially sound backing for the promised pensions." *Id.*

The *Peick* court assumed that under section 1381, withdrawal liability does not accrue until the employer withdraws from the pension plan, and the court upheld this interpretation of section 1381 against constitutional attack.[15] *Peick* did not authoritatively interpret the withdrawal provisions of MPPAA, but did suggest strong reasons for believing that section 1381 creates withdrawal liability only when an employer withdraws from a pension plan. However, the Seventh Circuit necessarily left open the possibility that courts might choose another, equally constitutionally permissible interpretation of section 1381.

Nonetheless, we find the reasoning of *Peick* persuasive. The *Peick* court read section 1381 naturally and provided powerful reasons for adopting its interpretation. We reject CTI's argument that section 1381 equates *withdrawal* liability with *unfunded vested* liability. The argument that withdrawal liability is merely a method of imposing an already determined unfunded vested liability is conceptually faulty and unsupported by the case law.

Moreover, nothing in the law or in the facts of this case suggests that, absent Nadustco's withdrawal from the union pension plan, the plan would *ever* have charged Nadustco over $200,000 to help fund the plan's unfunded vested liability. Nadustco's withdrawal liability stems solely from CTI's business decision to unburden itself of an unfavorable union contract, and Godchaux is not responsible for the fact of, or the timing of, that liability. We conclude, therefore, that Godchaux did not fail to inform CTI of Nadustco's withdrawal liability, since no such liability existed until Nadustco withdrew from the union pension plan.

### III.

We turn next to the second warranty which CTI claims Godchaux breached. CTI asserts that Fried, Rappaport & Co. did not prepare the financial statements according to generally accepted accounting principles (sometimes known as "GAAP") as Godchaux had warranted. Since the parties disagree both about what the terms of the contract mean and about whether Godchaux met his obligations under those terms, we focus on three separate sub-issues: First, we examine what rules to use to interpret and construe the contract between CTI and Godchaux and what standard of review applies to the district court's decision;[16] second, we address the issue of what the parties meant by the phrase "generally accepted accounting principles consistently applied"; and final-

---

**15.** Other cases support *Peick*'s reading of § 1381. *See Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 226 n. 8, 106 S.Ct. 1018, 1026–27 n. 8, 89 L.Ed.2d 166 (1986) ("Several sections of [MPPAA] moderate the impact of a withdrawing employer's liability by exempting certain transactions from being characterized as 'withdrawals.' "). *Bd. of Trustees of Western Conference of Teamsters Pension Trust Fund v. Thompson Bldg. Materials,* 749 F.2d 1396 (9th Cir.1984); *Republic Industries, Inc. v. Teamster Joint Council No. 83 of Va. Pension Fund,* 718 F.2d 628 (4th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984); *Washington Star Co. v. Int'l Typographical Union Negotiated Pension Plan,* 729 F.2d 1502 (D.C. Cir.1984); *Textile Workers Pension Fund v. Standard Dye & Finishing Co.,* 725 F.2d 843 (2d Cir.), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984). (These cases all note that

Congress enacted withdrawal liability in part to discourage withdrawals.) *See also Transport Motor Express, Inc. v. Cent. States Pension Fund,* 724 F.2d 575, 577 (7th Cir.1983) ("[I]f no withdrawal under the terms of the MPPAA has occurred, [a pension fund has] no basis for assessing withdrawal liability....").

**16.** The rules of contractual interpretation and construction and the rules of reviewing district court decisions are, of course, equally applicable to our discussion of Godchaux's first warranty in paragraph 6(g) of the contract. However, both parties agree on how to interpret that provision of the contract. Consequently, we discuss contractual interpretation and application and standards of review in this portion of the opinion.

ly, we consider whether Godchaux breached his warranty as it is properly construed and applied.

## A.

In a diversity case involving the interpretation of a contract, we must apply the substantive law of the state in which the district court sits, *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), including the choice-of-law rules of that jurisdiction. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Louisiana provides that the law of the place of contracting determines the nature, validity, and construction of that contract. *Porter v. American Optical Corp.*, 641 F.2d 1128, 1144 (5th Cir. Apr. 1981) (*citing United States Leasing Corp. v. Keiler*, 290 So.2d 427 (La.App.1974); *Bologna Brothers v. Morrissey*, 154 So.2d 455 (La.App.1963)). "Absent contrary intent by the parties, a contract is considered executed at the place where the offer is accepted or where the last act necessary to a meeting of the minds or to completing the contract is performed. *Williams v. Travelers Ins. Co. of Hartford, Conn.*, 19 So.2d 586 (La.App. 1944)." *Porter v. American Optical Corp.*, 641 F.2d at 1144–45. Here, the contract was executed and signed in Louisiana, and the law of that state accordingly governs its construction and application.

Louisiana will look beyond the contract's four corners only if it is ambiguous. *Oceaneering International, Inc. v. Black Towing, Inc.*, 479 So.2d 421, 424 (La.App.1985), *rev'd on other grounds*, 491 So.2d 1 (La. 1986). *See also Kemp v. Hudnall*, 423 So.2d 1260 (La.App.1982); La.Civ.Code Ann. art. 2046 (West 1987) ("When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.").

If the terms of the contract are ambiguous, however, very different rules apply. "In cases in which the contract is ambiguous, the agreement shall be construed according to the intent of the parties [*citing* La.Civ.Code Ann. art. 2045 (West 1987)]. Intent is an issue of fact which is to be inferred from all of the surrounding circumstances [where the contract is ambiguous]." *Kuswa & Associates v. Thibaut Construction Co.*, 463 So.2d 1264, 1266 (La.1985) (footnote omitted).[17]

■ Since the interpretation of a contract is a matter of law if the provisions of the contract are clear, we will review the district court's interpretation of this contract de novo if we determine that the terms of Godchaux's warranty are clear and unambiguous. *Kaspar Wire Works v. Leco Engineering & Machine, Inc.*, 575 F.2d 530, 533 n. 7 (5th Cir.1978) (issues of law are reviewed de novo). If, however, we determine that the terms of Godchaux's

---

**17.** This amounts to Louisiana's version of the parol evidence rule, a maxim of substantive law which we must apply in this case. We note, however, that the result would be the same if we were to apply federal law instead. As we held in *Carpenter's Amended & Restated Health Benefit Fund v. Holleman Constr. Co.*, 751 F.2d 763 (5th Cir.1985),

> Ordinarily, courts attempt to resolve ambiguities in a contract by looking to the contract itself, on the theory that the parties' words best represent their intentions. Ambiguous terms are interpreted in light of other terms in the contract, and inconsistencies are resolved through standard rules of interpretation—for example, that specific terms control over general terms, or that separately negotiated terms control over standardized terms. As long as the contract as a whole is coherent, ambiguities can be resolved as a matter of law, without looking beyond the four corners

of the document. In such cases, a reviewing court is not bound by the clearly erroneous standard of review. Since no issues of fact are involved, the reviewing court is as competent as the trial court to interpret the contract....

> In some cases, however, even by looking at the entire document, ambiguities cannot be resolved—the document as a whole is ambiguous. To resolve these ambiguities, a court can no longer rely solely on the language of the contract to determine the parties' intent, and must look to extrinsic or parol evidence. Consequently, in these cases, questions of contract interpretation are questions of fact, ... and the clearly erroneous standard of review applies. Fed.R.Civ.P. 52(a).

751 F.2d at 766–67 (citations and footnote omitted). *See also Paragon Resources, Inc. v. National Fuel Gas Distribution Corp.*, 695 F.2d 991, 995–96 (5th Cir.1983).

warranty are ambiguous after we search the four corners of the contract, then we will accept, unless clearly erroneous, the district court's findings of fact as to the intent of the parties. Fed.R.Civ.P. 52(a).

### B.

■ We begin with the language of the disputed warranty to determine what it requires. The warranty contained in Paragraph 6(f) assured CTI that "the financial statements of Nadustco ... have been prepared in accordance with generally accepted accounting principles consistently applied during the period January 1, 1975, to December 31, 1981...." That language, interpreted in the light of the contract as a whole, required Godchaux to ensure only that the financial statements be prepared according to those accounting professional norms which Nadustco's auditors had used to produce previous financial statements.

The term "generally accepted accounting principles" is a term of art that carries with it specific legal consequences. Standard accounting practice recognizes a hierarchy of "generally accepted accounting principles" comprised of general principles that pervade the practice of accounting, followed by the published standards of the American Institute of Certified Public Accountants ("AICPA"), followed by the prevalent customs and usages of the accounting profession, and completed by the remaining extant literature in the accounting field. Adler, *Accounting Principles in Litigation*, Prac. Law., Apr. 1988, at 43, 44–45. The heart of this system of accounting norms is the standards which AICPA's Financial Accounting Standards Board ("FASB") publishes. *Id.* at 45.

Despite these norms, "generally accepted accounting principles" are flexible. In *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979), the Supreme Court held:

> Accountants long have recognized that 'generally accepted accounting principles'

are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. 'Generally accepted accounting principles,' rather, tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management.

*Id.* at 544, 99 S.Ct. at 787 (footnote omitted).

*Thor* requires the district court to defer to the professional judgment of the accountant who prepared Nadustco's financial statements. This rule of law suggests that an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable accounting procedures when that accountant prepares a financial statement.[18] The rule also limits a district court, in reviewing such an accountant's work, to deciding only whether the accountant chose a procedure from the universe of generally accepted accounting principles.

Here, the district court was also required (by the contract) to determine whether the accountant preparing Nadustco's most recent financial statements chose to use accounting principles consistent with the principles used to prepare Nadustco's past financial statements. Aside from this general provision, however, the language of the contract does not restrict unequivocally, beyond the flexible limits of professional accounting norms, the accountant's discretion in preparing the controverted financial statements. Moreover, just as we must look to the accepted norms of accounting to define the term "generally accepted accounting principles," so too must we look to the practices used to prepare Nadustco's previous financial statements to interpret the phrase "consistently applied." Thus, we must conclude that the "four corners" of this contract do not resolve whether Godchaux breached this warranty, and we turn, consequently, to the extrinsic evidence the district court considered to determine the parties' intent.

---

**18.** For example, the phrase "generally accepted accounting principles," when used, as here, in the sale of one company to another, "should not be interpreted *in vacuo* but only in relation to the particular type of business involved." *Pittsburgh Coke & Chem. Co. v. Bollo*, 560 F.2d 1089, 1092 (2d Cir.1977).

Extrinsic evidence resolves several critical issues regarding the interpretation of the agreement. First, the purpose of the contract—to effect the sale of Nadustco—suggests that the parties wanted accurate financial statements to aid them in determining Nadustco's worth.[19] Having less than a month left between signing the agreement and closing the deal, the parties agreed to instruct Joel Rappaport, the accountant auditing Nadustco's past financial statements, to review, but not to audit completely, Nadustco's mid–1982 financial statement.

Once Rappaport released these financial statements, the parties renegotiated the price of Nadustco and eventually agreed to an amendment lowering that price to the amount appearing in the original sales agreement.[20] The amendment to the agreement contained a warranty similar to the one at issue here, asserting that Nadustco's financial statement of December 31, 1982, would "be prepared in accordance with generally accepted accounting principles applied on a consistent basis with the previous year's practices...." The warranty explicitly allowed the parties to readjust the terms of CTI's promissory note based on the information contained in the December 31, 1982, financial statement.[21]

The evidence strongly suggests that Godchaux warranted only that the financial statements of Nadustco accurately reported the *value of Nadustco.* We hold that it was not clearly erroneous for the district court so to find.

The extrinsic evidence also reveals that, under "generally accepted accounting principles," financial statements need not reveal *immaterial* information. Experts for both parties agreed that generally accepted accounting principles require only that an accountant reveal all *material* information on a financial statement; no standards of accounting practice require that an accountant reveal *immaterial* information.[22] Since the financial statements were prepared to determine only the value of Nadustco, the independent auditor was not required to include in the financial statement any information not material to that value. Here, information is "material" if it would have affected a reasonable business-person's evaluation of Nadustco's value.

*Black's Law Dictionary* (5th ed. 1979) states that a representation is "material" if it "relat[es] to [a] matter which is so substantial and important as to influence [the] party to whom [it was] made...." *Black's* at 880 (definition of "material"). In a fraud case, we held that, under Florida law, "[a] fact is material if but for the alleged non-disclosure or misrepresentation the complaining party would not have entered

19. When determining what information to include in a financial statement, an accountant may attach greater weight to the specific purpose for which the statement is being prepared than to the general purposes for which financial statements are prepared ordinarily. In a case remarkably similar to the one at bar, *Pittsburgh Coke & Chem. Co. v. Bollo,* the court upheld the method chosen to write off assets in a statement prepared pursuant to the sale of an airplane parts business. The Second Circuit held that generally accepted accounting principles did not require the accountant to ignore the nature of the business sold, *see supra* n. 18, provided that "[f]rom the commencement of negotiations to the closing date there was no concealment or misrepresentation of information *essential to the transaction.*" 560 F.2d at 1092 (emphasis added).

20. The amendment reduced the size of the promissory note from $300,000 to $227,000, and the price of Nadustco from $600,000 to $527,-000.

21. The parties ultimately did readjust the terms of the promissory note based upon that financial statement.

22. CTI relies heavily upon the statements and opinions of the FASB and the Accounting Principles Board (APB), particularly FASB, Statement No. 35, March 1980; FASB, Statement No. 36, May 1980; and APB, Opinion No. 8, November 1966. Each of these documents authoritatively describes some of the standard principles accountants apply in deciding what pension plan information to include in their clients' financial statements. However, experts for both parties agreed at trial that these standard reporting principles apply only where the undisclosed information is *material.* Moreover, FASB promulgated Statement No. 36 to govern what information an employer's financial statement should disclose concerning its pension plan. It says, "The provisions of this Statement need not be applied to immaterial items." Statement No. 36 at 5.

into the transaction." *Hauben v. Harmon,* 605 F.2d 920, 924 (5th Cir.1979). As we concluded in *Mamco, Inc. v. American Employers Insurance Co.,* 736 F.2d 187, 190 n. 6 (5th Cir.1984),

> The question of materiality generally arises in a context in which a deceiving party has induced a deceived party to undertake some act of detrimental reliance. In this context, 'materiality' expresses the notion that the deceived party would have acted differently had he known the truth about the fact misrepresented.[23]

Since the financial statements were designed only to reflect the value of Nadustco, those statements did not have to contain information not useful in assessing Nadustco's worth.

Finally, copies of Nadustco's financial statements dating back to 1975 revealed that those financial statements, prepared by two different accounting firms, had never revealed any information about Nadustco's union pension plan. Thus, the district court was not clearly erroneous in finding that Nadustco's accountants had consistently failed to mention Nadustco's union pension plan in its financial statements. This fact suggests, as the district court found, that the parties did not intend to require Rappaport to include information about the union pension plan in Nadustco's most recent financial statements.

We conclude that the district court correctly interpreted Godchaux's warranty that the two Nadustco financial statements would be prepared "in accordance with generally accepted accounting principles." As a matter of law, the term "generally accepted accounting principles" does not clearly and conclusively define what the parties meant by that term. We also conclude as a matter of law, however, that the language of the contract does limit how we may interpret this term. In particular, the text of the contract gave Rappaport the discretion to choose any of a variety of generally accepted accounting principles, provided those principles had been applied consistently since 1975 in preparing Nadustco's financial statements.[24]

We also conclude that the district court properly attempted to find what the parties factually intended, and that none of those findings was clearly erroneous. For example, the district court was not clearly erroneous in finding that the parties wanted the independent auditor to prepare financial statements that reflected only the value of Nadustco. The district court also properly found that "generally accepted accounting principles" required only that Rappaport reveal information material to Nadustco's value. Finally, it was not clearly erroneous to find that the accounting practices consistently applied to prepare Nadustco's financial statements since 1975 included the practice of not revealing any

---

**23.** The definition of "material" changes slightly from one area of the law to another. However, *Mamco* accurately describes the essential contours of the ordinary legal meaning of "materiality." As the Supreme Court has observed, "The question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 445, 96 S.Ct. 2126, 2130, 48 L.Ed.2d 757 (1976) (securities law). In securities law, at least, "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.* at 449, 96 S.Ct. at 2130.

In areas of the law outside securities regulation, the test for materiality is similar. In criminal law, due process forbids the prosecution from suppressing evidence favorable to the ac-

cused "where the evidence is material either to guilt or to punishment." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). The Supreme Court has ruled that, in the *Brady* context, "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed. 2d 481 (1985).

**24.** The contract stated not only that the financial statements were to be in accordance with generally accepted accounting principles, but also that those principles were to be "consistently applied during the period January 1, 1975 to December 31, 1981...." *See supra* n. 3.

information about Nadustco's union pension plan.

## C.

We turn now to the question of whether the district court was clearly erroneous in the way that it applied Paragraph 6(f) of the contract to the facts of this case. To find that Fried, Rappaport & Co. prepared Nadustco's 1981 and mid–1982 financial statements as Godchaux warranted, the district court had to find (1) that Rappaport used his professional judgment in declining to include information in the financial statements about the union pension plan; and (2) that Rappaport, within his discretion as an accountant, could decide not to include information about the union pension plan in the financial statement on the ground that this information was immaterial to the value of Nadustco. The district court found that the evidence supported these two factual conclusions. We now hold that the district court was not clearly erroneous in its findings of fact, and affirm the district court's decision that Godchaux did not breach his warranty.

The district court found that Rappaport exercised his professional judgment to determine that information about the union pension plan was not material to the financial statements which he audited and reviewed. The district court noted that Rappaport certified that he had prepared the reports according to "generally accepted accounting principles" and explicitly based its finding on this uncontested fact. While we agree that this finding of fact is sufficient in itself to support the district court's conclusion, we note also that other evidence on the record tends to support the district court's conclusion.

First, Fried, Rappaport & Co. had a check list of things to consider when preparing financial statements. Despite this check-off list, Rappaport apparently concluded that information about the union pension plan was immaterial to these statements. Second, evidence at both trial and in Rappaport's deposition suggests that these statements' discussion of Nadustco's separate non-union pension plan implicitly disclosed the existence of the union pension plan.[25] Rappaport apparently decided that in revealing the existence of the non-union pension plan, the financial statements had disclosed enough information about the union pension plan.

There was also ample evidence on the record that the unfunded vested liability of the union pension plan did not materially affect the value of Nadustco.[26] Experts for both Nadustco and CTI testified that the unfunded vested liability of the union pension plan would not in fact affect the "bottom line" value of Nadustco. Moreover, CTI knew of the existence of the multiemployer pension plan, the name of the pension plan, what employees were covered, how the plan was funded, and what was contributed in 1981 and 1982. Godchaux delivered the union contract, which contained most of this information, to CTI at the time of the sale. In addition, CTI operated Nadustco for a full year without ever complaining of the size of the union pension plan's unfunded vested liability. Given the parties' history of negotiating and renegotiating Nadustco's price even after the sale had been concluded, these facts alone suggest that the size of the unfunded vested liability did not change the value of Nadustco in the eyes of CTI.

Finally, the district court reviewed the accounting practices reflected in Nadust-

25. Of course, CTI has never pretended that it was unaware of the *existence* of the union pension plan.

26. CTI argued vociferously during and after trial that the union pension plan was a "defined benefit plan" determined by the benefit levels the plan administrators set for beneficiaries. Godchaux countered that the plan was a "defined contribution plan" because Nadustco was not required to pay more than a single, contrac-

tually-set rate for each hour Nadustco's covered employees worked. Whether the union pension plan was a defined benefit plan or a defined contribution plan is irrelevant, because the plan, however defined, did not materially affect the "bottom line" value of Nadustco. As both parties' accounting experts agreed, no generally accepted principles of accounting require financial statements to reveal immaterial information.

co's previous financial statements, and in financial statements prepared industry-wide, which suggested that information about the union pension plan's unfunded vested liability was not material. As we have already noted, accountants in two different accounting firms had failed since at least 1975 to include on Nadustco's financial statements any information about Nadustco's union pension plan. The trial testimony of Godchaux's accounting expert revealed that even "Big Eight" accounting firms do not always include information about corporate pension plans in the corporate financial statements, even where the client is as large as American Broadcasting Company ("ABC").[27]

We conclude that the district court properly held that Godchaux did not breach his warranty regarding the preparation of Nadustco's financial statements.

### IV.

■ CTI urges one additional ground for reversal—that the court abused its discretion when it denied CTI leave to amend its complaint, as CTI had requested shortly before trial, to allow CTI to allege securities fraud against Godchaux.[28] We find no need to reconsider the district court's decision here, however, since it has already decided implicitly against CTI on CTI's proposed action for securities fraud against Godchaux.

To make out a claim for securities fraud, CTI would have to allege and prove "(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which [CTI] relied justifiably (5) that proximately caused [CTI's] injury." *Huddleston v. Herman & MacLean,* 640 F.2d 534, 543 (5th Cir. Unit A Mar. 1981), *rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct.

683, 74 L.Ed.2d 548 (1983) (footnote omitted). Of course, any material omission of fact regarding the sale of Nadustco's stock would also breach Godchaux's warranty that Nadustco's financial statements had been prepared "in accordance with generally accepted accounting principles" to reflect accurately the value of Nadustco. Since the district court has already ruled, and we now affirm, that Nadustco's financial statements did not omit any fact material to the value of Nadustco, we must also deny any claims CTI has for securities fraud against Godchaux arising out of the sale of Nadustco, even assuming, *arguendo,* that the district court abused its discretion in denying leave to amend.

The judgment is AFFIRMED.

---

27. CTI reminds us that the withdrawal liability was approximately 40% of the total purchase price for the stock and hence must be "material." However, the test is not whether a sum in excess of $200,000 represents a "material" or "significant" sum of money for a company the size of Nadustco, but whether there was a material liability that affected the value of Nadustco as of the date of the sale.

28. Fed.R.Civ.P. 15(a) states: "[A] party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." We interpret this portion of the rule to require us to use the "abuse of discretion" standard to review district court decisions to deny a party's motion to amend its pleadings when that party may not do so as a matter of course. *Wedgeworth v. Fibreboard Corp.,* 706 F.2d 541 (5th Cir.1983).