**CENTRAL LOUISIANA ELECTRIC COMPANY, INC. and Southwestern Electric Power Company**

v.

**The DOLET HILLS MINING VENTURE, Mining Beteiligungs–GMBH & Co. KG, and Mansfield Mining Company**

No. Civ.A. 97–0728.

United States District Court, W.D. Louisiana, Shreveport Division.

March 1, 2000.

David R. Taggart, David A. Barlow, Barlow and Hardtner, L.C., Shreveport, LA, for Plaintiffs.

Robert A. Burgoyne, Fulbright & Jaworski, L.L.P., Washinton, DC, F.Drake Lee, Jr., Albert M. Hand, Jr., Cook, Yancey, King & Galloway, Shreveport, LA, for Defendants.

## MEMORANDUM RULING

STAGG, District Judge.

A hearing on Dolet Hills Mining Venture's motion pursuant to Rule 65(a) of the Federal Rules of Civil Procedure for a preliminary injunction against Central Louisiana Electric Company, Inc. and Southwestern Electric Power Company (hereinafter collectively referred to as "Project") was held before the undersigned on February 11, 1999 through February 12, 1999. The voluntary stay in the matter having been lifted (*see* Record Documents 148, 150 and 152), and having heard the evidence presented and read the briefs submitted by the parties, the court makes the following findings of fact and conclusions of law.[1]

### I. FINDINGS OF FACT

#### A. Stipulated Or Undisputed Facts.

#### 1. Preliminary Injunction Basis.

The plaintiffs/counter-defendants in this case are CLECO Corporation (successor by name change to Central Louisiana Electric Company, Inc.) ("CLECO") and Southwestern Electric Power Company ("SWEPCO"). The defendants/counter-plaintiffs in this case are the Dolet Hills Mining Venture and its constituent partners, the Mansfield Mining Company and Mining Beteilingungs–GMBH & Co. KG ("German Mining") (hereinafter collectively referred to as "DHMV" or "Miner"). The subject matter of this lawsuit is a long-term Lignite Mining Agreement ("LMA") entered into by Project and DHMV on March 16, 1982.[2] The relevant contract provisions fostering the dispute *sub judice* are those relating to DHMV's obligation to maintain a specified debt to equity ratio.

The legal relationships among the parties (including DHMV's relationship with its principle lender) are set forth in a series of very involved contracts. In this opinion, it will be necessary to cite provisions from:

(1) the LMA (dated March 16, 1982), *see* Record Document 113, Ex. 1;

(2) the Option and Security Agreement (dated March 16, 1982), *see id.*, Ex. 4A;

(3) the Third Amendment to the Option and Security Agreement (the "Third Amendment") (effective March 24, 1995), *see id.*, Ex. 4C;

(4) the Subordination Agreement (dated March 1, 1994), *see id.*, Ex. 5A; and

(5) the First Amendment to the Subordination Agreement (effective March 24, 1995), *see id.*, Ex. 5B.

The Third Amendment to the Option and Security Agreement and the First Amendment to the Subordination Agreement were confected in connection with the purchase of the 80% interest of one of the original partners of DHMV. *See infra* p. 730–31 (explaining the transaction).

On December 15, 1998, without any forewarning whatsoever, Project sent out two foreclosure notices ("Notices")—one to DHMV and one to DHMV's lender, The First National Bank of Chicago ("First Chicago"). The Notices are based upon DHMV's purported breach of Article 20.7 of the LMA, which requires DHMV to maintain a specified debt to equity ratio. The Notices assert that DHMV failed to comply with the LMA's debt to equity requirement; that this failure constituted a Major Default under the LMA; and that Project therefore had the right to institute foreclosure and acquisition proceedings and intended to do so.

The motion presently before the court— DHMV's motion for a preliminary injunc-

---

**1.** During the total of approximately fourteen hours of in-court testimony, there were eight witnesses. To a considerable degree, there was a variance between the testimony of the contending parties. Where documentary evidence is available on the point, the task of resolving testimonial conflicts is easier. On other issues, credibility choices are necessary.

**2.** A thorough disquisition of the facts of this case is contained in this court's ruling on the parties' motions for summary judgment. *See* Record Document 140.

tion—was filed in response to the Notices. The motion requests that the Court issue a mandatory injunction that requires Project to withdraw the foreclosure and acquisition Notices that it provided to DHMV and First Chicago.[3]

## 2. Relevant Provisions Of The LMA, Option And Security Agreement And Subordination Agreement.

Project's foreclosure Notices are based upon a purported breach of DHMV's obligations under Article 20.7 of the LMA, which provides:

20.7 Miner warrants, covenants and agrees:

(a) That it will, not later than Initial Operation, make an initial equity investment from its own cash resources of not less than Twenty-Five Million Dollars ($25,000,000.00) in the Mine.

(b) That it will at all times during the term of this Agreement **maintain a debt to equity ratio of not more than 2.8 to 1** (excluding from the above determination (1) any escrow, sinking or other fund maintained by Miner to provide the appropriate finance required for the closing of the Mine by Miner as required in paragraph 29.1 hereinbelow and (2) any escrow, sinking or other fund maintained by Miner to provide the appropriate finance required for the relocation and removal of surface structures referred to in Exhibit "A," Part 13(a) hereinbelow). The equity interest of Miner in any equipment shall be determined on the basis of audited book cost less accumulated depreciation, all done in accordance with generally accepted accounting principles consistently applied. Leases by which Miner acquires the possession and use of any equipment shall be included in the determination of Miner's debt to eq-

uity ratio referred to hereinabove by including both the corresponding asset and the discounted value of future lease payments, if such treatment is required to accord with generally accepted accounting principles consistently applied.

Record Document 113, Ex. 1 at 16–17 (emphasis added). Project contends that a breach of the debt to equity requirement constitutes a Major Default of Miner pursuant to Article 23.1(b) of the LMA. Article 23.1(b) defines an event of Major Default as follows:

For purposes of this Agreement, any one of the following events is a Major Default of Miner:

\* \* \* \* \* \*

(b)(1) Miner fails to perform any of its obligations under paragraph **20.7**, ... or (3) any one of the Parent Companies (as that term is defined in Exhibit "F" attached hereto and made a part hereof) fails to perform any of its obligations under paragraphs 5.2 or 5.3 or Exhibit "F," **and any such failure under (1), (2) or (3) above continues unremedied for sixty (60) days after written notice thereof shall have been given to Miner by Project.**

Record Document 113, Ex. 1 at 17–18 (emphasis added). The critical and serious consequences of an event of Major Default are set forth in Article 23.4 of the LMA which, among other things, gives Project the right to enforce its rights under the Option and Security Agreement. *See* Record Document 113, Ex. 1 at 20–21. Article 23.4(a) provides:

Upon the occurrence of any Major Default of Miner, Project, in addition to any other rights or remedies available to Project, except as herein noted, may terminate this Agreement or, in its discretion, terminate this Agreement and exercise (without any other prerequi-

---

**3.** On January 12, 1999, all parties stipulated that they would conduct themselves as if the December 15 Notices are irrevocably suspended pending a decision by this court. *See* Record Document 109.

sites) any of its rights, options and powers under the Option and Security Agreement....

Record Document 113, Ex. 1 at 20–21. Article 3.2 of the Option and Security Agreement (1) recognizes that DHMV may encumber all Equipment and Equipment Leases which may be subject to the Option and Security Agreement with a prior security interest; and (2) provides that in the event Project elects to foreclose on the collateral chattel mortgage, it shall "[a]t least twenty-one (21) days prior to foreclosure on the security interests ... give notice to each Prime Security Holder of its intent to foreclose on such security agreement." Record Document 113, Ex. 4 at F–4. Section 3.2 goes on to provide:

> In the event of (a) foreclosure by Project under the security interest(s) granted by Miner pursuant to this Article 3, and (b) ultimate acquisitions by Project of the Equipment as a result thereof, Project shall be entitled to the possession and use of the Equipment subject to the Prior Security Interest so long as (1) the outstanding indebtedness secured thereby is kept current, including any arrearages, and (2) Project gives notice to the Prime Security Holder of its intention to keep such indebtedness current within twenty-one (21) days of said ultimate acquisition.

Article 5.3 of the Option and Security Agreement, in language similar to that in Article 20.7 of the LMA, also addresses Miner's obligation to maintain a specified debt to equity ratio. Article 5.3 provides, in pertinent part:

> 5.3 The Parent Companies warrant, covenant and agree as follows:
>
> . . .
>
> (b) That Miner will at all times during the term of this Agreement **maintain a debt to equity ratio of not more than 2.8 to 1** (excluding from the above determination (1) any escrow, sinking or other fund maintained by Miner to provide the appropriate finance required for the closing of the Mine by Miner as

required in paragraph 29.1 of the Lignite Mining Agreement, and (2) any escrow, sinking or other fund maintained by Miner to provide the appropriate finance required for the relocation and removal of surface structures referred to in Exhibit "A," Part 13(a) of the Lignite Mining Agreement). The equity interest of Miner in any equipment shall be determined on the basis of audited book cost less accumulated depreciation, all done in accordance with generally accepted accounting principles consistently applied. Equipment Leases shall be included in the determination of Miner's debt to equity ratio referred to hereinabove by including both the corresponding asset and the discounted value of future lease payments, if such treatment is required to accord with generally accepted accounting principles consistently applied.

Record Document 113, Ex. 4A at F–5–F–6.

In March 1995, as part of the restructuring of DHMV's ownership, the parties entered into the Third Amendment, which provides, in relevant part, as follows:

> *Section 1.1—Option and Security Agreement.* The parties hereto acknowledge and agree that **any write-up of the book value of the assets of MINER that might be performed in connection with, or as a result of, the Purchase shall not be utilized for any purpose** in the interpretation, administration, application or performance of the Option and Security Agreement, including but not limited to, the determination of the following:
>
> (a) The price [to] be paid by CLECO and SWEPCO pursuant to Section 2.3 of the Option and Security Agreement; and
>
> (b) The equity interest of Miner in the Miner's equipment pursuant to Section 5.3 of the Option and Security Agreement;

*provided that,* for the purposes of applying the provisions of Section 5.3 of the Option and Security Agreement, the Option and Security Agreement is hereby supplemented and amended so that from the Effective Date until April 1, 1996, JONES[4] will be required to have MINER maintain a debt to equity ratio of not more than 3.2 to 1, determined as provided in said Section 5.3; *provided further* that, from and after April 1, 1996, JONES will be required to have MINER maintain a debt to equity ratio of not more than 2.8 to 1, determined as provided in said Section 5.3.

Throughout the term of the Lignite Mining Agreement, JONES will cause MINER to furnish to PROJECT a statement setting forth the calculation of the debt to equity ratio as of the last day of the immediately preceding month as provided in Section 5.3 of the Option and Security Agreement (in such detail as reasonably required by PROJECT), certified by MINER's chief financial officer, subject to year-end audit adjustments. Such statement shall be furnished by MINER to PROJECT, as soon as available, but in any event within 15 days after the end of each month.

*Section 1.2—Subordination Agreement.* The parties hereto acknowledge and agree that **any write-up of the book value of the assets of MINER that might be performed in connection with, or as a result of, the Purchase shall not be utilized for any purpose** in the interpretation, administration, application or performance of the Subordination Agreement, including but not limited to, the determination of the "Designated Indebtedness" under the Subordination Agreement.

Record Document 113, Ex. 4C at 3-4 (emphasis added). The Subordination Agreement among DHMV, Project and First Chicago provides in relevant part:

8.1 CLECO and SWEPCO will serve upon [First Chicago] a copy of any notice of Major Default served upon Miner pursuant to the [LMA] concurrently with the service of such notice on Miner (such notice being herein called the "Project Default Notice").

. . . .

8.3 Upon delivery to [First Chicago] of the Project Default Notice, ... CLECO and SWEPCO shall have the right, at their option, to notify [First Chicago] within twenty-one (21) days after the delivery of ... such Project Default Notice ... that CLECO and SWEPCO undertake pursuant hereto (i) to acquire all of the Equipment and the Equipment Leases pursuant to either Article 2 or Article 3, or both, of the Option and Security Agreement, and (ii) to comply with the applicable provisions of this Agreement with respect thereto, including Section 8.4 and Article 9 hereof (said notice, which shall include a current inventory of all of Equipment and Equipment Leases, is herein called the "Acquisition Notice").

Record Document 113, Ex. 5A at 12.[5]

## B. The Court's Findings Of Fact.

The LMA is one contractual component of a joint project developed by CLECO and SWEPCO to take advantage of Louisiana's extensive lignite reserves as a fuel source. Much of DHMV's financing to sustain its obligations under the LMA has been provided through commercial loans. DHMV's principal lender is First Chicago. As of December 31, 1998, DHMV owed First Chicago approximately $58 million. Most of that amount is secured by DHMV's mining equipment and other assets.

The original partners in the Dolet Hills Mining Venture, and the original signato-

---

4. *See infra* p. 730–31 (explaining the Jones entities).

5. All facts above are either stipulated or undisputed. Other facts are set forth extensively in the Memorandum Ruling of June 3, 1999, (*see* Record Document 140 at 1–10) and are incorporated herein by reference.

ries to the LMA, were Costain Mining (Dolet Hills), Inc., Costain Australia Mining Pty. Limited and Mansfield Mining Company. The Costain companies were subsidiaries of Costain Holdings, Inc. and Costain Australia Limited. Mansfield Mining was a subsidiary of J.A. Jones Construction Company. The Costain companies owned 80% of DHMV, and Mansfield Mining owned 20%. J.A. Jones Construction Company is a subsidiary of J.A. Jones, Inc., which, in turn, is a subsidiary of Phillip Holzmann AG. German Mining is wholly owned by its general partner, Mining Beteilingungs–GMBH and its limited partner, Holzmann Anlagen GMBH, which wholly owns the general partner and which itself is a wholly-owned subsidiary of Holzmann AG. In March 1995, Mansfield Mining and German Mining (hereinafter collectively referred to as the "Jones Companies")[6] purchased Costain's 80% interest in DHMV and the LMA. The purchase price was $75.8 million, which consisted of $61 million in cash plus the assumption of $14.8 million in long-term debt. CLECO and SWEPCO expressly consented to the Jones Companies' acquisition of Costain's interests in DHMV.[7]

Mr. William Garnett, the president of Jones Capital Corporation, apprised Project that the Jones Companies intended to acquire the Costain interest. Mr. Garnett further advised that he anticipated a substantial increase in the book cost amounts reported to Project and that such a write-up in DHMV's asset values would adversely affect Project rights under the LMA and the Option and Security Agreement. *See supra* note 5. Project objected to Mr. Garnett's proposal. By letter dated March 20, 1995, Project advised that it could not

"accept or agree to any write-up of the book value of Miner's assets in connection with or resulting from the acquisition by Mansfield Mining and German Mining of all of the partnership interest held by Costain for any purpose." Record Document 113, Ex. 20. Project's letter was a roadblock to the consummation of the acquisition. The Third Amendment to the Option and Security Agreement and the First Amendment to the Subordination Agreement were two inducements to have Project consent to the transaction. These agreements incorporated Project's objection to any use by DHMV of any write-up in the book value of its assets. Furthermore, after a request from DHMV, Project relaxed the debt to equity requirement for a period of one year from 2.8 to 1 to 3.2 to 1.

To summarize, the debt to equity requirement is governed by the LMA, including the Option and Security Agreement. Article 20.7 of the LMA contains DHMV's representation and warranty that "it will at all times during the term of [the LMA] maintain a debt to equity ratio of not more than 2.8 to 1." Record Document 113, Ex. 1 at 16. Article 5.3 of the Option and Security Agreement consists of the same representation and warranty made by an affiliate of DHMV's partners, J.A. Jones, Inc. *See* Record Document 113, Ex. 4A at F–5. Article 20.7(b) provides that "[t]he equity interest of Miner in any equipment shall be determined on the basis of audited book cost less accumulated depreciation, all done in accordance with generally accepted accounting principles consistently applied." Record Document 113, Ex. 1 at 16–17. The Third Amend-

---

**6.** Throughout the extensive briefing of these issues, the parties have repeatedly referred to these companies as the "Jones Companies." The court adopts the parties' designation.

**7.** In fact, Project was evidently aware that DHMV was going to be borrowing additional funds to finance this venture, as evidenced by language in a letter from Malcolm Holderness, attorney for Jones Capital Corporation, to Malcolm Murchison, one of Project's attor-

neys ("As Claude [De Mars] and I mentioned on the telephone, the added borrowing by Miner that is intended in connection with the acquisition of the Costain interests in Miner will present a problem under the 2.8 to 1 debt to equity ratio, if no write-up of assets is allowed, for only the first year after the closing. After that, due to scheduled loan repayments, the 2.8 to 1 ratio, even without any write-ups, will not present a problem." Record Document 113, Ex. 18).

ment prohibits DHMV from utilizing any write-up in the book value of DHMV's assets resulting from the Purchase in the calculation of the debt to equity ratio under the LMA and the option price under the Option and Security Agreement. *See* Record Document 113, Ex. 4C at 3–4. Section 1.1 of the Third Amendment also requires DHMV to furnish Project a statement every month "setting forth the calculation of the debt to equity ratio ... in such detail as reasonably required by PROJECT, certified by MINER's chief financial officer." *Id.*

The purchase of the Costain interests closed on March 24, 1995. From that date until about July of 1996[8], there was no expression of concern by Project about the debt to equity ratio. The allowance period of 3.2 to 1 passed uneventfully and no request was made or complaint raised about the monthly reporting required in the Third Amendment or its brief absence[9] (which report was not required in the original Option and Security Agreement). However, on October 18, 1996, Project formally expressed its dissatisfaction with the form and content of DHMV's monthly statement. In this court's opinion, this sudden critique of DHMV's monthly statement evolved following an August 6, 1996 "Contract Meeting" involving employees and attorneys of Project, the subject of which was contained in an e-mail. *See* Record Document 113, Ex. 6. The e-mail from Mr. Riche, former Project manager, stated the following:

> As you are aware, the lignite project executive committee has asked that a group be formed between CLECO, SWEPCO, and CSW to address concerns about the high cost of lignite under the DHMV Lignite Mining Agreement (LMA). The purpose of the team is to develop recommendations on a course of action which would result in

reduced unit fuel costs for the long term. The study will require your input and ideas, economic analysis and a long term mine modeling study.

The following is the agenda proposed for the meeting. . . .

### AGENDA—DHMV CONTRACT MEETING

1. INTRODUCTION
2. REVIEW OF 3/4/96 CONTRACT MEETING
3. UPDATE OF DHMV PROPOSALS
4. CURRENT ISSUES WITH DHMV
   —high cost
   —sulfur swings
   —reclamation concerns
   —changes in mine plan-area H
   —avoidance cost—area M
   —credit for mining unit 2 reserves (K pods, area DS)
   —25 yr. term vs. 62.5 mmton contract
5. REVIEW OF CURRENT CONTRACT TERMS
6. LAND CONTROL—TERM OF LEASES AND LOC PERMIT TERM
7. PRELIMINARY LIST OF ALTERNATIVES TO BE STUDIED:
A. LET CONTRACT CONTINUE TO TERM (APRIL 2011), THEN:
   1) WESTERN COAL
   2) MINE OURSELVES
   3) HIRE ANOTHER MINER
B. **RENEGOTIATE CONTRACT—TAKE MORE TONS NOW AND SHORTEN TERM, THEN DO 1, 2, OR 3 ABOVE**
C. BUY OUT CONTRACT, THEN DO 1, 2, OR 3 ABOVE

---

8. On July 3, 1996, Project reminded DHMV that it was required to provide a monthly statement "setting forth the calculation of the debt to equity ratio." Record Document 113, Ex. 27.

9. DHMV's chief financial officer, Mr. Avery, stopped sending monthly statements at some point in 1995 under the mistaken belief that the certification requirement ended when DHMV's ratio fell below 2.8 to 1.

D. **BUY DOWN CONTRACT AND SUBSTITUTE WESTERN COAL OR MORE RRMC**

E. EXTEND TERM IN EXCHANGE FOR REDUCED PRICE OR VOLUME NOW

F. **SEEK LEGAL AVENUES OUT OF CONTRACT**

G. ANY OTHERS?

. . . .

Record Document 113, Ex. 6 (emphasis added). In this new-age of computers, instantaneous communications, faxes, and the like, this is one of the very few e-mail "smoking guns" that have been found in the evidence offered against a party in this court. While this pointed missive does not control the result in this brutish contest, it has had the effect of clouding Project's arguments on the issues being decided.

The current dispute between DHMV and Project concerning the debt to equity ratio has its origins in a series of conversations and letters exchanged between the parties at least fifteen months following the Purchase. These communications span a period of time from the Fall of 1996 to the present. By letter dated October 18, 1996, Project notified DHMV that its debt to equity statement for the month ended August 31, 1996, was "inadequate as it does not set forth the calculation of the debt to equity ratio of the Miner, nor does it contain a certification by the Miner's Chief Financial Officer as provided in Section 1.1 of the Third Amendment." Record Document 113, Ex. 34 at 2. In this letter, Project advised DHMV that:

Section 20.7(b) of the Lignite Mining Agreement (the "LMA") and Section 5.3 of the Option and Security Agreement between CLECO and SWEPCO ("Project") and Miner each require the Miner to maintain a debt to equity ratio of 2.8 to 1.0. Failure to do so is an event of Major Default under Section 23.1(b) of the LMA. The purpose of this requirement was to provide assurances to Project that the Miner would maintain its financial condition so that it could fulfill its obligations under the LMA.

Record Document 113, Ex. 34 at 1. Project requested that all future statements contain the following additional detail "[i]n order for Project to assure itself that the Miner is not in default of the LMA by virtue of having exceeded the stipulated ratio of debt to equity (whether with the additional debt incurred by the Miner in connection with the Purchase or otherwise)", including:

(a) the total amount of the Miner's debt utilized in the calculation of the Miner's debt to equity ratio;

(b) the total amount of the Miner's equity utilized in the calculation of the Miner's debt to equity ratio;

(c) the express written certification by the Miner's chief financial officer that the Miner's debt to equity ratio is calculated without utilizing any write-up of the Miner's assets in connection with, or as a result of, the Purchase; and

(d) the detailed information necessary to determine the correctness of the amounts included and excluded from the calculations under Section 20.7 of the LMA.

Record Document 113, Ex. 39 at 2–3. DHMV responded to Project's October 18, 1996 letter in a November 7, 1996 letter, in which it agreed to cause its treasurer "to add a specific certification to his monthly informational letter to the effect that the debt to equity ratio has been calculated without utilizing any write-up of our assets in connection with, or as a result of, the purchase by Jones Capital Corporation in 1995 of Costain's interest." Record Document 113, Ex. 36. On December 16, 1996, Project responded by letter to DHMV's November 7th letter, wherein counsel for Project reiterated that it considered DHMV to be in "noncompliance with the Agreement" for failure to provide the "detail reasonably required." Record Document 113, Ex. 40 at 1. In the December 16th letter, Project's counsel demanded that DHMV comply with Project's request for additional detail in the statements and

warned that "[s]hould you fail to comply with this demand, we will recommend to [Project] that they pursue all remedies available at law to insure compliance, including appropriate legal proceedings." *Id.* at 3. Additionally, Project "demand[ed] . . . that Miner comply with the Project Requests within the next *fifteen* days. . . ." *Id.* By letter dated December 31, 1996, DHMV's counsel advised Project that:

It is DHMV's position that, given the provisions of Sec. 1.1, the commercial context in which Sec. 1.1 was included in the [Third Amendment to the Option and Security Agreement] and other relevant considerations, that report is (1) in compliance with the requirements of Sec. 1.1 of the [Third Amendment], and (2) legally sufficient to satisfy the legitimate commercial expectations of the Project.

Record Document 113, Ex. 43 at 1. In response, Project again notified DHMV in a letter of January 21, 1997, that DHMV's "refusal to provide the [requested] information is a breach of the obligations incumbent upon [Miner]." Record Document 113, Ex. 47 at 1. Project further advised that such a breach leaves Project "no choice but to believe that its interest may have been placed at substantial risk—a risk which the debt-to-equity ratio agreement was specifically negotiated and agreed to avoid." *Id.* DHMV responded to Project's December 16th and January 21st letters with a February 14, 1997 letter (the "Garnett Letter") from Mr. Garnett, the president of Jones Capital Corporation. Jones Capital Corporation is the parent of Mansfield Mining Company, of which Mr. Garnett is also president. In pertinent part, the letter stated:

We did not anticipate any difficulty in interpreting how the calculations would be performed at the time the Amendment was executed. We were incorrect in this assumption and have concluded, among ourselves, that the Project's inquiries on this matter have resulted in a misunderstanding. We appreciate your bringing this question to our attention.

In conjunction with my staff, I have determined that there may be more than one method of determining the adjustments to book equity due solely to the Purchase. Pursuant to Michael Avery's January 16, 1997 letter, the equity portion of the debt to equity ratio is first adjusted by adding the monthly book earnings and subtracting any partner withdrawals as has always been the case (the "operating adjustments"). Pursuant to the Amendment, the book equity has also been adjusted by subtracting the write-up in book equity due to the Purchase and adding the adjustments for amortization on asset write-up (goodwill) and that portion of interest directly attributable to the Purchase (the "Purchase Adjustments"). The monthly calculation is shown in the attachment as Method A. A second method (shown as Method B in the attachment) is to only include those Purchase Adjustments which decrease the book equity by eliminating the adjustments for amortization of goodwill and interest attributable to the Purchase.

Record Document 113, Ex. 48 at 1. The letter was copied to First Chicago through its in-house counsel.

Project responded to the Garnett Letter by letter dated March 4, 1997, approximately one month before Project filed this civil action. In the March 4th letter, Project notified DHMV that:

[t]he statements in your letter that this language is subject to interpretation in a way which would allow DHMV to increase the equity calculation by *adding* back the amortized goodwill resulting from the write-up of the DHMV assets in the purchase of Costain's interest is startling and contrary to the language of the Amendment and Mr. Avery's representations in his prior correspondence. *See, e.g.,* letter dated January 16, 1997. Project finds it difficult to overlook such action as an excuse for failing to comply with the provisions of Section 1.1 of the Amendment. "Method A" results in a

calculated debt-to-equity ratio which conceals the impact of the debt incurred by DHMV. Project rejects any such calculation and method as permitted under the LMA or the Amendment.

Method B may be acceptable if the values for equity and debt, as specified in accordance with the contract documents, are used and verified by Project. However, the methodology disclosures in your letter, as well as your acknowledgement that there may even be other methods of calculating the debt-to-equity ratio under the LMA, leads Project to the conclusion that the underlying debt and equity values must be audited by Project. . . .

Record Document 113, Ex. 51 at 2. The March 4th letter concluded by reiterating Project's request to audit the underlying debt and equity values "to confirm that the appropriate debt-to-equity ratio is being maintained by DHMV in accordance with the LMA, the Amendment and the other contract documents" and to "eliminate any other possible 'misunderstandings' that DHMV may have concerning the proper determination" thereof. *Id.* This letter of March 4, 1997 was copied to First Chicago through its counsel. Thereafter, DHMV sent a debt to equity representation stating that the Garnett Letter Method B was used. *See e.g.* Record Document 113, Ex. 53. Project rejected such certifications "as either correct, appropriate or in conformity with [DHMV's] contractual obligations." Record Document 113, Ex. 54 at 1.[10]

On April 15, 1997, Project filed suit against DHMV. *See* Record Document 1. During 1998, partial summary judgments were sought by both sides and were ruled on by the court on June 3, 1999. *See* Record Document 140. On December 31, 1998, DHMV filed a motion for preliminary injunction. *See* Record Document 76. In its motion, DHMV sought a mandatory preliminary injunction that would require Project to withdraw the foreclosure and

acquisition notices that Project served on DHMV and its lender, First Chicago, on December 15, 1998. Specifically, DHMV prayed that the court:

(1) "issue a mandatory preliminary injunction that requires Project to withdraw the foreclosure and acquisition Notices that it provided to DHMV and First Chicago"; and

(2) order "Project . . . to comply with the LMA's notice and cure requirement before sending any additional default or acquisition Notices that are based upon a purported violation by DHMV of the LMA's debt-to-equity requirement."

Record Document 76 at 5.

Two issues are presently before the court: (1) whether DHMV breached the debt to equity requirement of Article 20.7 of the LMA or Sections 1.1 or 1.2 of the Third Amendment; and (2) whether, if this court determines that DHMV was in breach of the LMA, a breach of this type would have constituted a Major Default under the LMA—specifically, whether Project complied with the notice requirements of the Major Default provisions, as required under Article 23.1(b)(1) of the LMA. DHMV asserts that there has been no Major Default for two distinct reasons:

(i) Project failed to provide DHMV with proper notice of the alleged breach and a 60–day cure period, as required under the LMA; and, in any event,

(ii) DHMV has complied at all relevant times with the LMA's debt to equity ratio requirement.

*See* Record Document 76 at 2. DHMV's preliminary injunction motion was based upon the first of these contentions. At the hearing, however, both parties presented evidence on the merits of both the notice issue and the issue of DHMV's compliance

---

**10.** Throughout the exchange of this correspondence, DHMV never failed to deliver at least the tonnage of lignite nominated by Project each year and Project has never rejected

any of the lignite delivered by DHMV. DHMV has delivered more than 32 million tons of lignite to Project since deliveries began in 1985.

with the required debt to equity ratio. In an order entered January 22, 1999, this court advanced the notice issue for resolution on the merits. *See* Record Document 89. Because both parties also presented evidence on whether DHMV has complied with the debt to equity requirements of the LMA, the court hereby advances that issue for resolution on the merits as well.[11]

## II. CONCLUSIONS OF LAW

### A. Civil Code Provisions.

Louisiana's Civil Code contains extensive provisions governing the interpretation and enforcement of contracts. The law regarding interpretation of contracts was set forth by this court in its June 3, 1998 ruling on the summary judgments filed by the parties. *See* Record Document 140 at 12–13. However, these legal principles are sufficiently crucial to the resolution of the matter presently before the court to be reiterated herein. In *Carter v. BRMAP*, 591 So.2d 1184, 1187–88 (La.App. 1st Cir.1991), the court stated:

> Contracts have the effect of law on the parties thereto and must be performed in good faith. La. [Civ.Code] art.1983. Interpretation of a contract is the determination of the common intent of the parties. La. [Civ.Code] art.2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the intent of the parties. La. [Civ.Code] art.2046. Conversely, when the terms of a contract are susceptible to more than one interpretation, it is ambiguous and parol evidence may be used to show the true intent of the parties and various rules of

interpretation become applicable. La. [Civ.Code] arts. 2045 *et seq.; Dixie Campers, Inc. v. Vesely Company*, 398 So.2d 1087 (La.1981). Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract. La. [Civ.Code] art. 2048. A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. La. [Civ.Code] art. 2049. . . .

In a diversity action involving the interpretation of a contract, this court must apply the substantive law of Louisiana, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), including the choice-of-law rules. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). When a contract is not ambiguous, this court has no authority to reach beyond the four corners of the document. *See Huggs, Inc. v. LPC Energy, Inc.*, 889 F.2d 649, 653 (5th Cir.1989). On the other hand, a contract is ambiguous according to Louisiana law when "it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction." *See Lloyds of London v. Transcontinental Gas Pipe Line Corp.*, 101 F.3d 425, 429 (5th Cir. 1996) (citation omitted). Applying this standard to the instant facts, the court finds the relevant contract provisions to be ambiguous. Accordingly, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is

---

**11.** The following witnesses appeared and testified:

(1) J. Mark Garrett (CPA and partner at KPMG Peat Marwick);

(2) Jake L. Netterville (CPA and principal in the accounting firm of Postlethwaite & Netterville; past Chairman of the American Institute of Certified Public Accountants);

(3) Michael E. Avery (DHMV's chief financial officer and Chartered Management Accountant (a professional designation recognized in England));

(4) Claude DeMars (in-house CPA employed by Jones Capital);

(5) James Gummel (former Vice-President of Mining in the Technical Services Groups of First Chicago);

(6) Richard A. Riche (former Project Manager);

(7) Thomas Golden (CPA with Price Waterhouse Coopers L.L.P.); and

(8) Peter M. Bratlie (CPA with Robertson, Bailes & McClelland, L.L.P).

given the meaning suggested by the contract as a whole." La.Civ.Code art.2050. Contract provisions susceptible to different meanings should be interpreted "to avoid neutralizing or ignoring any of them or treating them as surplusage," *Lambert v. Maryland Cas. Co.*, 418 So.2d 553, 559–60 (La.1982), and "to preserve the [ ] validity [of the contract]," *Gibbs Const. Co., Inc. v. Thomas*, 500 So.2d 764, 769 (La.1987) (citation omitted). "Louisiana courts will not interpret a contract in a way that leads to unreasonable consequences or inequitable or absurd results even when the words used in the contract are fairly explicit." *Texas Eastern Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 742 (5th Cir.1998) (citing *Makofsky v. Cunningham*, 576 F.2d 1223, 1229 (5th Cir.1978)). "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La.Civ.Code art.2053.

## B. The Merits.

### 1. Notice.

As previously mentioned, DHMV filed this motion for preliminary injunction seeking to have this court order Project to withdraw the foreclosure and acquisition Notices and to comply with the LMA's notice and cure provision before sending any additional Notices. Essentially, DHMV contends that even *if* it was in default, the LMA dictates that Project provide a specific notice to DHMV which details the alleged breach and allows DHMV 60 days to cure the alleged problem before it may mature into a Major Default. Article 23.1(b) specifically states that if Miner fails to perform any of its

obligations under certain paragraphs, including 20.7, which addresses the debt to equity requirement, and if any such failure "continues unremedied for sixty (60) days after written notice thereof shall have been given to Miner by Project," then a Major Default occurs. Record Document 113, Ex. 1 at 18. DHMV asserts that it was not given an appropriate or sufficient contractual notice. Project, however, contends that DHMV was provided sufficient notice through various letters and documents that were exchanged between the parties, including the complaint. Project further argues that the notice requirement was suspended by the fact that DHMV refused to allow Project to review its financial records.

■ First, Project argues that DHMV was provided notice by way of various letters that Project sent to it and by way of Project's original complaint. However, the language contained within the numerous letters sent by Project to DHMV is not sufficient to constitute notice of a breach of the debt to equity requirement, resulting in DHMV's awareness that it had 60 days thereafter to cure or a Major Default under the LMA would occur.[12] Specifically, none of the letters informed DHMV that it was being viewed as in *breach* of the debt to equity ratio required under the LMA and none of the letters specified the time period allowed to cure the alleged breach. The letters simply indicated that Project needed access to DHMV's financial records in order *to determine* whether DHMV was in compliance with the debt to equity ratio. This vague reference is not enough.[13]

The relevant provision of the LMA only requires "written notice" of an alleged failure to perform. However, although a no-

---

12. Furthermore, the LMA specifically states that "[g]eneral correspondence is not categorized as notice." Record Document 113, Ex. 1 at 3 (Article 1.15).

13. The language in Project's complaint was equally non-specific as the language contained in its letters to DHMV and was insuffi-

cient to constitute effective notice. *See also Crow v. Southern Natural Gas Co.*, 210 So.2d 596, 601 (La.App. 2d Cir.1968) (finding that a notice resulting from a judicial demand is not compliance with the terms of the contract, when the contract required only "written notice to the other").

tice of default does not require any particular form, a notice of default must have notified DHMV that Project regarded the LMA as breached by certain acts or non-acts and that a Major Default would result unless the default was promptly remedied. *See e.g. Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1121–22 (5th Cir.1978). A close examination of the letters sent to Project reveals them to be merely a recitation of the relevant contract provisions followed by a request to audit DHMV's books to determine compliance with the debt to equity requirement. Nothing in the letters indicates in any way that Project considered the debt to equity requirement *breached* and that 60 days following the letter, a Major Default would occur. Serious, and oft-times disastrous, legal and financial consequences attend a declaration of default, particularly in cases such as this involving multi-million dollar contracts.[14] Given the consequences that follow a declaration of default, it is *vital* that the declaration be made in terms sufficiently clear, direct and unequivocal to inform the breaching party that it has defaulted on its obligations. *See Atlantic Banana Co. v. Standard Fruit & S.S. Co.*, 493 F.2d 555, 560 (5th Cir.1974) (finding that threats of termination are not sufficient). If deprived of this clear notice of default, parties would be reluctant to enter into otherwise profitable contracts. Nothing in the record before this court indicates that the parties intended such an impractical result. *See e.g. L & A Contracting Co. v. Southern Concrete Services, Inc.*, 17 F.3d 106, 110–11 (5th Cir.1994) (discussing obligations of a notice of default when a surety is involved). Under this standard, Project did not sufficiently place DHMV on notice that Project considered DHMV to be in breach of the debt to equity requirement of the LMA and that, unless cured in 60 days from notice, the breach would mature into a Major Default. *See Cuoco v. Pik–a–Pak Grocery Corp.*, 379 So.2d 856, 860 (La.App. 4th Cir.1980) (discussing 5 day notice requirement contained in a lease necessary prior to termination); *Filmline (Cross–Country) Productions, Inc. v. United Artists Corp.*, 865 F.2d 513, 516–518 (2d Cir. 1989). None of the letters Project sent to DHMV contained an unequivocal declaration of default. *See id.* As Project admitted in its written closing argument, it was simply "question[ing]" DHMV's calculation of the debt to equity requirement and it "*expected* full and exact compliance with the debt-to-equity covenant." Record Document 118 at 20 (emphasis added). This "questioning" is not sufficient. The written notice must be "something more than the mere recitation" of the contractual duty. *Lewis v. Texaco Exploration and Production Co., Inc.*, 96–1458 (La.App. 1 Cir. 7/30/97), 698 So.2d 1001, 1010. If the written notice were only required to contain general statements, DHMV would be at a severe disadvantage because Project would regularly and routinely send out such general demands, regardless of knowledge of any specific problem. This would defeat the obvious purpose of the notice provision, which is to give DHMV reasonable notice of a problem or deficiency and the *opportunity to correct it.* Therefore, this court finds that the intent of the notice provision is that the notice be of a more specific nature, so as to reasonably alert DHMV and to allow for an appropriate investigation of the problem.

In its closing argument, Project admits that had it been given the financial information which it sought (which this court has since determined that it was *not* entitled to review, *see* Record Document 140 at 24–30 [15]), it would have "immediately sent a **detailed and explicit notice telling DHMV to either inject the capital (or remove the debt) necessary** to comply

---

**14.** DHMV's investment in the mine exceeds $95 million in cost. *See* Record Document 116 at 103.

**15.** In its previous ruling on this issue presented in the parties' motions for summary judg-

ment, this court found that Project was "not entitled to a review of DHMV's books and records to verify compliance with [the debt to equity] ratio." Record Document 140 at 26.

with the debt-to-equity requirements of the LMA within 60 days or face termination of the LMA." Record Document 118 at 24 (emphasis added). Why, then, could not Project have sent such a "detailed and explicit" notice to DHMV *initially* if it suspected that DHMV was in breach of the debt to equity requirement of the LMA? In answer to this question, Project contends that DHMV's actions in withholding its financial information estops DHMV from arguing that it did not receive adequate notice. The court disagrees. Effective notice would have required DHMV to illustrate that it was in compliance with the debt-to-equity ratio within 60 days or else be subject to a finding of Major Default. Had the parties *still* disagreed whether DHMV was in compliance at that point, action likely would have been taken to prevent a determination of Major Default. This does not, however, excuse or nullify the express requirement in the LMA of proper notice of a breach of the debt to equity requirement. Regardless, this situation did not occur, as Project never sent DHMV an appropriate or sufficient contractual notice of a breach of the debt to equity requirement.

Furthermore, in a letter dated June 3, 1997, Project sent a clear and precise default notice to DHMV specifically providing an unqualified "sixty (60) days written notice as required by § 23.1(c) of the LMA and demand[ing] that DHMV take immediate action to eliminate [alleged regulatory] deficiencies." Record Document 113, Ex. 58. This letter warned DHMV that "[a] failure to take immediate action to comply with this demand will constitute a Major Default under Article 23 of the LMA." *Id.*[16] The letters which Project contends provided notice to DHMV of the breach at issue bear no resemblance to the above-quoted language. The court is aware that the June 3, 1997 letter containing proper notice language of an alleged breach occurred after the letters and complaint of which Project contends gave DHMV notice of the alleged breach of the debt to equity requirement. However, the letter of June 3, 1997 is persuasive evidence that Project is aware of how properly to place DHMV on notice of an alleged default. *See also* La.Civ.Code art. 2053 ("A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.").

■ Finally, Project's failure to provide notice to DHMV was not excused or suspended by DHMV's refusal to allow Project to review DHMV's financial records. If such were the case, Project could have provided notice of the purported breach after obtaining access to DHMV's financial records in discovery in this lawsuit. Additionally, Project's reliance on DHMV's refusal to allow Project to review its records is suspect in that Project had not formally requested this review for at least fifteen months after the Third Amendment had been executed. Regardless, if Project even *suspected* that DHMV was not in compliance with the debt to equity requirement, it could have simply provided a *proper* notice of breach and provided a specific 60 day opportunity to cure the default instead of continuously hinting at the *possibility* of such a breach. This court will not allow Project to seek a Major Default of a contract with consequences of such magnitude without being specific in its allegations of default.[17] It is

---

**16.** Additionally, in the December 15, 1998 foreclosure and acquisition notice sent to First Chicago by Project, Project unequivocally entitled the correspondence "Project Default Notice and Acquisition Notice." Record Document 113, Ex. 3. Notably, the foreclosure notice sent to DHMV from Project on the same date referred simply to "Notice of Exercise of Rights Pursuant to Article 3 of Option and Security Agreement." *See id.* at Ex. 2.

**17.** Project asserts that given DHMV's rejection of Project's position as to how the debt to equity ratio should be calculated, no notice sent—no matter how detailed and explicit—would have caused DHMV to take any action to cure its breach. This court disagrees and finds that notice would not have been a "vain and useless act," as Project contends.

not possible for the parties to have contemplated such an absurdity and this court finds that such was not the intent of the parties. The overriding objective of this court is to implement "the common intent of the parties," La.Civ.Code art.2045, and this court may not "interpret a contract in a way that leads to unreasonable consequences or inequitable or absurd results even when the words used in the contract are fairly explicit." *Texas Eastern Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 742 (5th Cir.1998).

After a careful review of all of the documents exchanged between the parties, this court finds that Project failed to provide DHMV with proper written notice of its alleged breach of the debt to equity ratio requirement. As a result, DHMV never had an opportunity to cure that alleged breach, which is required under Article 23.1(b) of the LMA; therefore, the breach of the debt to equity requirement did not mature into a Major Default. Accordingly, this court finds that DHMV did not receive proper notice of an alleged breach of the debt to equity requirement. Furthermore, in the future, Project must comply with the notice provisions of Section 23.1(b) and provide DHMV with specific, detailed notice, such as that used in its June 3, 1997 letter of default.

### 2. Debt To Equity Requirement.

### (a) Basic Principles Of Law.

During the preliminary injunction hearing, this court stated:

Well, let me tell you now what my contemplation is. When you read the opinion in this matter, it's going to start with the quotation brought on by a question to a witness who said accounting is an art, not a science. Do you remember that colloquy? I'll find it in the record and cite it appropriately. But that's going to be the beginning paragraph of the opinion that will result from this hearing, "accounting is not a science, it's an art," and you have so far presented me with some consummate artists. How

I should interpret their artistry, and not science, may take a while.

Record Document 116 at 456 (quoting testimony of Mr. Garrett at 198).

The dominant issue currently before this court is the determination of whether DHMV has breached Section 20.7 of the LMA and its relevant debt to equity requirements. DHMV vehemently denies that it has ever breached the debt to equity ratio and Project adamantly argues that DHMV has been in breach of the ratio since the date of the Jones–Costain transaction. An intimate understanding of accounting terms and principles is necessary to resolve this dispute. To assist the court in its understanding of this intricate accounting area, DHMV presented four witnesses with accounting knowledge, including two experts, and Project presented two experts in accounting. Testifying for DHMV were Mr. Avery, Mr. DeMars, Mr. Garrett and Mr. Netterville. *See supra* note 8 (for a description of the qualifications of the witnesses). Testifying for Project were two accountants—Mr. Bratlie, and Mr. Golden. *See supra* note 8. Throughout this accounting testimony, numerous references were made to the concept of generally accepted accounting principles ("GAAP").

GAAP is a term of art that carries with it specific legal consequences. Standard accounting practice recognizes a hierarchy of generally accepted accounting principles comprised of "(1) general principles that pervade the practice of accounting, followed by (2) the published standards of the American Institute of Certified Public Accountants [ ], followed by (3) the prevalent customs and usages of the accounting profession, and completed by (4) the remaining extant literature in the accounting field." *Godchaux v. Conveying Techniques, Inc.*, 846 F.2d 306, 315 (5th Cir. 1988) (citing Adler, *Accounting Principles in Litigation*, Prac.Law., Apr. 1988, at 43, 44–45). Despite these norms, GAAP is flexible. *See id.* In *Thor Power Tool Co. v. Comm'r of Internal Revenue*, 439 U.S.

522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979), the Supreme Court held:

> Accountants long have recognized that "generally accepted accounting principles" are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. "Generally accepted accounting principles," rather, tolerate a range of "reasonable" treatments, leaving the choice among alternatives to management.

*Id.* at 544, 99 S.Ct. at 787 (footnote omitted). The rules of law espoused in *Thor* suggest that an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable accounting procedures when that accountant prepares a financial statement. These rules also limit this court, in reviewing such an accountant's work, to deciding only whether the accountant chose a procedure from the universe of GAAP. GAAP may not alter the terms of the Third Amendment; however the Third Amendment can restrict the acceptable accounting principles to be used in calculating the debt to equity ratio. *See Godchaux,* 846 F.2d at 317.

The debt to equity issue involved a classic battle of the experts. The credibility determination of witnesses, including experts, is peculiarly within the province of this court. *See Orduna S.A. v. Zen–Noh Grain Corp.,* 913 F.2d 1149, 1154 (5th Cir. 1990). The resolution of this issue requires this court to make a judgment as to the relative credibility of the testimony given by numerous experts—two totally conflicting sets—evaluated in light of the direct evidence supporting each set of opinions.

**(b) Applying The Basic Principles.**

■ A *thorough* review the evidence relating to the debt to equity issue has been conducted by this court. This review encompassed the debt to equity statements, as well as the accounting records and data from which such statements were generated, all of which were introduced as evidence during the hearing on February 11–12, 1999. The parties agree on the basic principles to be applied to the analysis of the debt to equity determination, *i.e.*, that the meaning of equity is assets minus liabilities and that the debt to equity ratio is calculated by dividing the debt by the equity.[18] However, they were poles apart on the application to the facts *sub judice.* Section 20.7(b) of the LMA and Section 5.3 of the Option and Security Agreement provide that DHMV shall "maintain a debt to equity ratio of not more than 2.8 to 1." Record Document 113, Ex. 1 at 16 and Ex. 4A at F–5. Notably, Section 1.1 of the Third Amendment relaxed the requirements of the debt to equity ratio by increasing the maximum ratio to 3.2 to 1 from 2.8 to 1 during the period from the Jones Companies' acquisition from Costain until April 1, 1996. *See* Record Document 113, Ex. 4C at 3. At the crux of this dispute is the following language from Section 1.1 of the Third Amendment: "any write-up of the book value of the assets of MINER that might be performed in connection with, or as a result of, the Purchase shall not be utilized for any purpose in the interpretation, administration, application or performance of the Option and Security Agreement." *Id.*

As previously discussed herein, in February 1997, in response to Project's inquiries about the calculation of the debt to equity ratio, Mr. Garnett sent a letter to Project indicating that he believed two methods were available to DHMV when calculating the debt to equity ratio in accordance with the Third Amendment—Method A and Method B. *See* Record Document 113, Ex. 48. Mr. Garnett's letter

---

18. According to DHMV's experts, Mr. Garrett and Mr. Netterville, the technical meaning of "debt" is long term bank debt. Project's experts, Mr. Golden and Mr. Bratlie, testified that "debt" is not limited to long term bank debt but rather includes all liabilities. The testimony of all experts revealed, however, that either method of calculating debt—long term debt or total liabilities—could be used when calculating the debt to equity ratio. The court finds no error in DHMV's use of long term debt in calculating the ratio.

then detailed how Method A and Method B were calculated. Project responded on March 4, 1997, by letter, indicating that it rejected Method A as a proper calculation, but that Method B might be permissible if DHMV were using the appropriate figures. *See id.,* Ex. 51. Thereafter, DHMV sent its required certifications of its debt to equity using Method B. *See e.g.,* Record Document 113, Exs. 52, 55–56, 59, 61, 63–66 and 68.

Project contends that DHMV's Method A purports to reverse the purchase transaction as if it never happened and that DHMV's methods of calculating the debt to equity financial covenant require that the Third Amendment be completely rewritten. Essentially, Project asserts that DHMV is removing $41 million in real debt that it incurred as a result of the purchase transaction.[19] The court agrees with Project that the Third Amendment does not allow DHMV to ignore its real debt for the purpose of calculating the debt to equity ratio but, instead, adds a limitation on the assets to be used in the calculation. However, the evidence at trial indicated that DHMV is **not** excluding this debt when calculating the ratio. *See* Record Document 116 at 247–48. After an exhaustive review of the testimony and the exhibits presented, this court finds that DHMV is properly excluding the write-up of the book value of the assets as a result of the Purchase when calculating the debt to equity ratio and is also properly including the $41 million in real debt incurred when calculating the ratio.

The prohibitory language in Section 1.1 of the Third Amendment provides that "any write-up of the book value of the assets" of DHMV in connection with the Purchase "shall not be utilized for any purpose." Record Document 113, Ex. 4C at 3. Both of Project's experts testified that the literal language of Section 1.1 can

be applied as written by simply removing or backing out the $46,637,485 write-up in the book value of DHMV's assets so that the write-up is not "utilized" in the calculation. This, however, was done by DHMV in its calculations.

During the relevant time period, DHMV used two methods to calculate its debt to equity ratio under the LMA: Method A and Method B. Four witnesses, including two experts, testified that both Methods A and B complied with Section 1.1 of the Third Amendment—Mr. Avery, Mr. DeMars, Mr. Garrett and Mr. Netterville. When asked: "Method A . . . does not take into account any write-up of the book value of the Miner resulting from the purchase in any respect, does it?", Mr. Garrett testified, "That's correct." *See* Record Document 116 at 217. When next asked, "Nor does Method B . . . take into account the write-up of the book value of the assets performed in connection with the purchase transaction?", Mr. Garrett again answered, "That's correct." *Id.* It was Mr. Garrett's opinion that Method A would qualify as the more literal translation of the Third Amendment language but that Method B could also be a reasonable interpretation of that section. *See id.* at 205–06. Mr. Garrett has 24 years of auditing experience and his firm has been the outside, independent auditor for DHMV for all of its existence.

Mr. Netterville testified that DHMV's debt to equity ratio has at all relevant times been calculated in a manner that complies with Section 1.1. *See* Record Document 116 at 392. Mr. Netterville stated that in interpreting contractual provisions from the perspective of a CPA, he would

    try to put them in accounting terminology and have them make accounting sense as well as economic or business

---

19. It is undisputed that on the books of DHMV there was a $46,637,485 write-up in the book value of DHMV's assets that resulted from the Jones Companies' acquisition of the Costain interest. No new assets were acquired by DHMV, but DHMV did incur an additional $41 million in debt to First Chicago. The Jones Companies used a $41 million loan *to DHMV* from First Chicago to pay a large portion of the price for the purchase of the Costain interest in DHMV but did not incur any debt themselves.

sense. So I would use that experience in trying to understand and interpret that agreement and have it make some accounting sense as well as some business sense. I think both parties have agreed that the Project's interpretation does not make accounting sense.

*Id.* at 391–92. Mr. Netterville was of the opinion that DHMV has "been in compliance from the date of the purchase." *Id.* at 392. It was also Mr. Netterville's opinion that the write-up of the assets of Miner in connection with the Purchase was not being used in Method A. *See id.* at 394. To Mr. Netterville, Method B was more conservative. *See id.* at 394–95. Finally, Mr. Netterville testified that it was his opinion that Method A most originally comports with his understanding and training and experience as an accountant and conforms at the same time to the relevant provisions of Section 1.1. *See id.* at 399.

Mr. Netterville stated that the court will have to "make a judgment" regarding the parties' intent when interpreting Section 1.1, and that, in his view, that judgment should attempt "to make some business sense" out of the contract language. Record Document 116 at 426. The court agrees and specifically accords greater credibility to the testimony of Mr. Netterville and Mr. Garrett than to the testimony of Project's experts. As Mr. Netterville and Mr. Garrett testified, the Third Amendment is silent regarding how the right side of the balance sheet should be adjusted in connection with any write-up of DHMV's assets resulting from the Costain acquisition; it is therefore appropriate to apply GAAP in making the balance sheet entries on the right side of the ledger, which was done by DHMV. *See* Record Document 116 at 215–16 and 236. In other words, Mr. Netterville and Mr. Garrett did not use GAAP to vary the words of the

Third Amendment, they applied GAAP in the absence of any contrary language. This application of GAAP was entirely reasonable under the language of Section 1.1 of the Third Amendment. As the Supreme Court stated in *Thor*, GAAP "tolerate[s] a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. Comm'r of Internal Revenue*, 439 U.S. 522, 544, 99 S.Ct. 773, 787, 58 L.Ed.2d 785 (1979).

If the court were to accept the reasoning of Project's experts, DHMV has had a negative equity since the moment the Costain acquisition closed in March of 1995. Under Project's interpretation, DHMV was in default of the LMA, the Option and Security Agreement, and its Credit Agreement with First Chicago before the ink was even dry on the Costain acquisition papers. Mr. Bratlie, one of Project's experts, acknowledged that, under Project's interpretation, DHMV would have been required to repay $42 million to First Chicago or infuse that much capital immediately after the Purchase in order to comply with Section 1.1—even though the debt to equity ratio had been negotiated to be increased from 2.8 to 1 to 3.2 to 1.[20] *See* Record Document 116 at 536–37. Similarly, Mr. Golden, Project's other expert, testified that, under Project's interpretation, the Jones Companies would "need about $36 million, either in a cash infusion or to assume that much of the note back," in order to cure the alleged breach today—in other words, DHMV would have to write a check almost as large as the $41 million they first borrowed from First Chicago in order to comply with the debt to equity ratio.[21] Record Document 116 at 296. Furthermore, Mr. Golden admitted that even if the permitted debt to equity ratio had been increased to 1,000 to 1, DHMV

---

**20.** As Mr. Golden admitted, Project's interpretation renders meaningless the language in Section 1.1 regarding the increase in the permitted debt to equity ratio. *See* Record Document 116 at 293–94.

**21.** When DHMV's counsel asked Mr. Golden whether Project's counsel had told him how the provisions of the Option and Security Agreement and the Third Amendment were intended to operate, Mr. Golden replied, "Yes." Record Document 116 at 290.

would nevertheless have immediately been out of compliance under his interpretation. *See* Record Document 116 at 293. This explanation is absurd, especially in light of the disclosure to Project of the transaction. *See e.g.,* Record Document 113, Ex. 18 (a letter to Project's counsel wherein DHMV informs Project it will be borrowing additional funds in connection with the Purchase and that this borrowing "will present a problem under the 2.8 to 1 debt to equity ratio, if no write-up of the assets is allowed, for only the first year after the closing").[22]

Project was aware that DHMV was borrowing funds for the Jones–Costain transaction and Project consented to the Purchase with the proviso that any write-up in the book value of DHMV's assets in connection with the Purchase could not be used for any purpose. In addition, Project expressly consented to an increase in the debt to equity ratio from 2.8 to 1 to 3.2 to 1 during the year following the acquisition so that DHMV would be able to be in compliance with the required debt to equity ratio for that year when considering the new debt.[23] Furthermore, and most tellingly, Project never once formally complained about the calculation of this ratio until at least fifteen months later—after Project wanted to find a way out of the contract. Project's extended silence supports DHMV's contention that its method of calculation was intended by the parties at the time of contracting and it further indicates to this court that Project initially

agreed with DHMV's method of calculating the debt to equity ratio and only now that it seeks ways to terminate the contract does Project contend that the ratio is being calculated improperly.[24]

The result is equally absurd when considered from the perspective of First Chicago. First Chicago loaned DHMV $41 million in connection with the 1995 Costain acquisition. Prior to the acquisition, First Chicago had investigated DHMV's financial condition, *see* Record Document 116 at 319–20, and, as Mr. Gummel, an employee of First Chicago and former Vice President of Mining in the Technical Services Group, testified, First Chicago would not have loaned $41 million to DHMV if DHMV would immediately be in default of the LMA's debt to equity requirement, *see id.* at 321. Therefore, to accept Project's interpretation, one would have to conclude that First Chicago loaned $41 million to DHMV with the knowledge that DHMV would immediately go into default of both the LMA and the Restated Credit Agreement and result in an immediate loss to the bank of its security for loans totaling $58 million.

DHMV contends that Project's interpretation of Section 1.1 directly conflicts with the commercial expectations of the parties and of First Chicago in entering into the Third Amendment and the First Amendment to the Subordination Agreement because it would render superfluous the language in Section 1.1 pursuant to which

---

**22.** Project contends that it is reasonable to require that the write-ups which had no value to Project not be utilized for any purpose and that it is reasonable to required that the $41 million in debt actually incurred by DHMV be included in the calculation of the debt to equity ratio. The court agrees. However, the evidence illustrated that DHMV is properly excluding the write-up and including the debt when calculating the debt to equity ratio.

**23.** Project asserts that when DHMV requested that Project permit the debt to equity ratio to increase for one year following the Purchase, DHMV did not provide Project with Mr. DeMars' calculation of debt to equity. However, even assuming Project did not have DHMV's

calculation, this does not explain the months that passed without any complaints once Project did receive the calculations. Additionally, it does not appear that Project inquired as to the relevant accounting figures behind the requested increase in the debt to equity ratio.

**24.** This is not meant to imply that the court views Project as having waived its ability to object to any improper calculation of the ratio, as Article 8 of the LMA specifically provides that a failure to insist upon strict performance of any provision of the LMA shall not release DHMV of its obligation to comply with the LMA. *See* Record Document 113, Ex. 1 at 7 (Article 8—Non–Waiver of Rights).

DHMV's permitted debt to equity ratio increased from 2.8 to 1 to 3.2 to 1 and it would produce absurd consequences that cannot be reconciled with the intent of the parties. The court agrees. To accept Project's interpretation, this court would have to conclude that DHMV, Project and First Chicago (1) entered into the Third Amendment and the First Amendment to the Subordination Agreement knowing that DHMV would immediately be in default of the LMA's debt to equity ratio requirements, and (2) knowingly allowed DHMV's default status to persist for at least fifteen months thereafter. Project's interpretation of the contract leads to absurd consequences and is implausible as it runs afoul of various other provisions in the contract.

"A provision [in a contract] susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." La.Civ.Code art.2049. The only interpretation of the contract which keeps all of the provisions in this contract effective is to conclude that DHMV's calculation of the debt to equity ratio complies with the contract. If this court were to agree with Project's calculation of the debt to equity ratio, DHMV would be in immediate default as soon as the Purchase was consummated and the negotiated temporary increase in the debt to equity ratio would be meaningless. The explicit provisions of the Civil Code pretermit such an interpretation and this court cannot, as a matter of law, find that this specifically requested increase was without meaning.

Accordingly, in light of the record presently before the court, DHMV's request that this court order Project to withdraw its foreclosure and acquisition notices must be **GRANTED,** as DHMV was properly calculating the debt to equity ratio and was not in breach of the debt to equity ratio requirement in Section 20.7 of the LMA.

## III. CONCLUSION

Based on the foregoing analysis, the court finds that DHMV's request that this court order Project to withdraw its foreclosure and acquisition notices must be **GRANTED,** as DHMV was properly calculating the debt to equity ratio and was not in breach of the debt to equity ratio requirement in Section 20.7 of the LMA. Furthermore, Project failed to provide DHMV with the proper notice of the alleged breach and a 60–day cure period as required under the LMA. In the future, Project must comply with the notice provisions of Section 23.1(b) and provide DHMV with specific, detailed notice of any alleged breach prior to it maturing into a Major Default.

An order consistent with the terms of this Memorandum Ruling shall issue herewith.